THE STATE v. HOWARD, *Appellant.*

1. **Criminal Law:** MANSLAUGHTER. Where defendant ordered deceased out of his house which order was obeyed without any demonstration of violence, and defendant followed with a deadly weapon and shot the deceased, the crime cannot be reduced to manslaughter, although deceased had previously made threats against the defendant which were communicated to the latter.

2. ———:——— : PROVOCATION. Provoking or insulting words or mere verbal threats, standing alone, constitute no such provocation as will reduce a killing to manslaughter, though they may give character to acts, and, where there is a present demonstration of violence insufficient in itself to justify the killing or reduce it to manslaughter, the added words may have that effect.

3. ———: EVIDENCE : IMPLIED ADMISSIONS OF ACCUSED. Statements
implicating a person accused of crime, made in his presence and
hearing and not denied by him, are not admissible as implied
admissions, where he was under arrest at the time they were made.

4. ———: ———: ———. Where such statements tend only to
identify the defendant as the person who did the act, which is
shown by other evidence on both sides and is not disputed, their
admission could not prejudice the accused and will not constitute
reversible error.

5. ———: ———: IMPEACHMENT OF WITNESS : PROOF OF CONVICTION
OF CRIME. For the purpose of discrediting a witness it may be
shown that he has been convicted of crime, but the mere fact that
he has been arrested is inadmissible for that purpose.

6. ———: ———: ———: ———. While evidence that a witness has
been arrested for minor offenses is not admissible for the purpose
of discrediting him, yet, where it shows that he was never con-
victed, the error in admitting it was harmless.

*Appeal from St. Louis Criminal Court.*—HON. J. C.
NORMILE, Judge.

AFFIRMED.

*C. P. & J. D. Johnson* and *Silver & Brown* for
appellant.

(1) The court committed error in overruling
defendant's objection to the evidence of officer Becker-
ton, wherein he testified that after defendant's arrest
he took him to the bedside of the deceased at the city
hospital and asked the deceased if he knew defendant,
to which deceased replied : "I ought to ; he put a
bullet in my belly," and that he was Howard. This
was in effect making the defendant testify against him-
self, and was erroneous. Cons. of Mo., art. 2, sec. 23 ;.
*State v. Jacobs*, 5 Jones (N. C.) 259 ; *Blackwell v.
State*, 67 Ga. 76 ; *Day v. State*, 63 Ga. 667 ; *Stokes v.
State*, 5 Baxter (Tenn.) 610 ; *People v. Mead*, 50 Mich.
228 ; 1 Burr's Trial, 245 ; 1 Greenl. Ev., sec. 1 ; Rey-
nolds' Theory of Ev., p. 4. (2) The state was improp-
erly permitted to ask the witness, McKenna, if he had

ever been arrested for stealing. *First.* A witness cannot be interrogated on a subject not pertinent to the issue for the mere purpose of discrediting him. *Harper v. Railroad*, 47 Mo. 468 ; Wharton on Crim. Ev., sec. 472. *Second.* It was not the best evidence. *State v. Lewis*, 80 Mo. 110. ( 3 ) The court committed error in failing to instruct the jury on a grade of manslaughter. *First.* A demonstration of violence, with accompanying threats or words, will reduce the killing to manslaughter. *State v. Elliott*, 98 Mo. 150 ; 2 Bishop Crim. Law [ 6 Ed.] sec. 704. *Second.* The evidence tended to show that the homicide was the result of a sudden quarrel, and this authorized an instruction on manslaughter. *State v. Berkley*, 92 Mo. 41, 54; *State v. Wingo*, 2 Curtis, C. C. 1. *Third.* A defendant is entitled to instructions on the different grades of homicide the evidence tends to show. *State v. Wilson*, 85 Mo. 134 ; *State v. Barham*, 82 Mo. 67. And the rule extends to instructions predicated on the defendant's own evidence. *State v. Banks*, 73 Mo. ; *State v. Partlow*, 90 Mo. 626.

*John M. Wood*, Attorney General, and *A. C. Clover*, Circuit Attorney, for the State.

( 1 ) The instructions fully covered the law of the case, were in the most approved form, and in all respects unexceptionable. But three theories were presented by the evidence, murder, either in the first or second degree, and self-defense. ( 2 ) The testimony of the officer as to what occurred at the hospital, when appellant was taken by him into the presence of Kelly, was clearly competent. *State v. Devlin*, 7 Mo. App. 32 ; *State v. Miller*, 49 Mo. 505 ; *State v. Hamilton*, 55 Mo. 520 ; *State v. Walker*, 78 Mo. 380. ( 3 ) This testimony only tended to show who fired the shot, which was shown by other evidence and admitted by defendant. Its admission was harmless and no ground for reversal. *State v. Hamilton*, 55 Mo. 520; *State v. Owens*, 78 Mo. 367. .

BLACK, J.—The defendant was convicted of murder in the second degree, and sentenced to twenty years' imprisonment, on an indictment for murder in the first degree, for killing John Kelly.

Instructions were given upon murder in the first and second degrees, and upon self-defense. The errors assigned are, a failure of the court to instruct upon manslaughter, and the introduction and exclusion of evidence.

Kelly, the deceased, and one Horner, went into the defendant's saloon on the night of the twenty-ninth of October, 1887. Defendant and Kuehne and several other persons were in the saloon at the time; the last-named persons were throwing dice for the drinks. Kuehne, having lost, invited the persons present, including Kelly, to drink, and they accepted the invitation. Defendant then proposed to Kuehne to "shake for the house," to which the latter agreed. This time the defendant lost, and Kelly and others drank again at his request. Defendant said to Kelly, "You are drunk," to which the latter replied, "I don't have to look far for a partner." Other remarks of a like character were made by and between them, when the defendant and Kuehne engaged for another game of dice. They asked Kelly to act as referee, but he declined, saying he knew nothing about the game. Defendant lost again, and made the remark that he "guessed he would have to treat." At the same time he fixed his eyes upon Kelly and said: "I believe you sons of bitches came in here for trouble." He immediately ordered Kelly out of the house. Kelly walked to the door and went out. The defendant then stepped behind the counter, got a pistol, pulled off his coat, and followed Kelly and shot him while both parties were on the sidewalk. The foregoing is in substance the evidence of a number of eye-witnesses introduced by the state.

VOL. 102—10

The defendant, testifying in his own behalf, in substance, said : "Kelly came in the saloon with his right hand in his pocket. Kuehne asked Kelly to take a drink, and I watched Kelly, because I had been warned that he intended to take my life. I spoke to him in a friendly way, and he said, 'You son of a bitch, I got it in for you,' and I then said, 'I hear you have; now you get out of my house as quick as possible.' I started towards him and he and his friends backed out of the door. When I got out of the door I found three or four more around me. I saw these men crowding up close to me, and I said, 'Keep back.' Kelly turned and started towards me, and I told him to stop; as he advanced, I shot him; in other words, the pistol was discharged, and I did not know whether he was shot or not, and the other parties ran. Kelly was ten or fifteen feet from me at first, and advanced to within four or six feet of me. His hand was in a threatening attitude, and I supposed at the time that he had a knife in his hand. I thought my life was in danger, and that I was going to be attacked either in front or behind."

One other witness, introduced by the defendant, who was passing at the time, says he saw defendant step from one door to another on the outside ; that he heard defendant say "stop;" that Kelly was then approaching defendant, and defendant shot. The witness says he saw no other persons around, and did not notice that Kelly held his hand in a threatening attitude.

There had been some previous difficulty between defendant and Kelly and Kelly's associates, and there is evidence tending to show that defendant had ordered Kelly to keep away from the saloon. The witness, McKenna, says he heard Kelly say, "I am going to do the big son of a bitch up," and that a few days before this shooting he informed defendant of what Kelly had said. A Mr. Goodstein testified that, some four months before the shooting, he saw three or four parties come

out of the defendant's saloon, when one of them said:
"I will kill that big bastard;" that he communicated
this threat to the defendant.    Other evidence tends to
show that Kelly was one of these persons.

1. The first question is, whether this is a proper
case for instructions upon manslaughter.    It is not con-
tended that the case falls within any of those cases of
manslaughter which are described and defined by the
statute; but the claim is, that instructions should have
been given under section 1250, Revised Statutes, 1879.
That section provides: "that every other killing
of a human being by the .act  *  *  *  of another
which would be manslaughter at common law,
and which is not excusable or justifiable, or is
not declared to be manslaughter in some other
degree, shall be manslaughter in the fourth degree."
We are then to inquire whether there is evidence
in this case tending to reduce the offense to man-
slaughter at common law.    The evidence on both sides
shows beyond all doubt that the killing was intentional.
Bishop says where the killing is intended, and is not
lawful, it is generally murder; but under circumstances
of provocation, or of mutual combat, it may be reduced
to manslaughter.    2 Bish. Crim. Law [6 Ed.] sec. 695.

Now the evidence for the state shows that defend-
ant followed deceased up and shot him without any
provocation whatever.    The defendant, it is true, testi-
fied to certain threatening and abusive language used
by the deceased.    But the law is well settled that pro-
voking or insulting words, or mere verbal threats, will
not reduce the killing to manslaughter.    Standing alone
they constitute no such provocation as will reduce the
crime below murder.    It is very true that words may
give character to acts, and are admitted in evidence to
explain connected acts; so that if there is a present
demonstration of violence, insufficient in itself to justify
the killing or reduce it to manslaughter, the added
words may have that effect.    2 Bish. Crim. Law [6 Ed.]

sec. 704; *State v. Elliott*, 98 Mo. 153. But the defendant's version of the matter does not show that deceased had any weapon, or made any demonstration of violence, whilst the parties were in the saloon. The defendant ordered the deceased out of the house, and the deceased obeyed the order, and defendant followed up with a deadly weapon and shot deceased. There is no evidence of any provocation which will reduce the killing to manslaughter. Nor does the evidence tend to show a case of mutual combat. To say nothing about the merits of the defense of justifiable homicide in self-defense, it is clear there is no case here for instructions upon manslaughter at common law.

2. During the night of the homicide, the officer who arrested defendant took him to the hospital to which deceased had been removed. This officer testified : " I took Howard up to the side of the table where Kelly was lying. I asked him if he knew this man (pointing to Howard). He said : 'I ought ; he put a bullet in my belly.' Howard did not say a word ; he was under arrest at this time." This evidence was admitted, we presume, on the principle that, statements made in the presence and hearing of a party, and not denied, are implied admissions ; but the rule has no application when the person is under arrest at the time the statements are made in his presence. *State v. Young*, 99 Mo. 674 ; *State v. Mullins*, 101 Mo. 514. This error, however, should not operate as a reversal, for the evidence only tended to identify the defendant as the person who shot Kelly, a fact disclosed by the evidence on both sides and not disputed by anyone. The evidence could not have prejudiced the defendant. *State v. Hamilton*, 55 Mo. 520 ; *State v. Owens*, 78 Mo. 367.

3. The witness McKenna having testified that he had seen deceased at the defendant's saloon on several occasions, and that he heard deceased make the threats against defendant, before narrated, was asked, on cross-examination by the prosecuting attorney, if he had ever

been arrested for stealing, to which he replied that he had never been convicted for stealing, and that he had never been convicted in his life. The witness, being again pressed with questions as to whether he had been arrested for stealing, stated, over the objections of the defendant, that he had been arrested for breach of the peace and for something else, but for what he could not say.

A conviction may be put in evidence for the purpose of discrediting a witness, but the mere fact that he has been arrested is inadmissible for any such purpose. The evidence should have been excluded. Such a cross-examination is simply badgering the witness, and can have no other effect but that of bringing the administration of the law into disrepute, and produce reversals where cases have been otherwise well tried. As this evidence, showing that defendant had been arrested for minor offenses, shows, also, that he was never convicted, we do not see how it could have prejudiced the defendant. The error was a harmless one in this case.

The evidence of this witness only goes to show threats made by the deceased and communicated to defendant,—threats which deceased never attempted to carry into execution, lest it was when defendant was chasing him with a pistol. We are not prepared to say the court would have erred had it refused to instruct upon self-defense.

The judgment is affirmed. All concur.