THE STATE v. COCHRAN, Appellant.

Division Two, February 7, 1899.

1. Criminal Practice: CONTINUANCES. Matters of continuance rest largely within the discretion of the trial court, and unless it appear that this discretion has been unwisely exercised the appellate court will not interfere.

2. ———: ———: PRESUMPTION. The presumption is that the ruling of the trial court on the application for a continuance is correct, and it devolves on the party complaining to convict it of error and to show that its ruling was prejudicial to him.

State v. Cochran.

3. ——: ——: ——: DILIGENCE. The defendant told his counsel to have "Scott Richardson's largest boy" subpoenaed, and they issued a subpoena for his *oldest* son, but this was not that one of his boys wanted. The witness for whom the subpoena was intended, had gone into another State at the solicitation of deceased's brother, since the instruction to have him subpoenaed was made. The mistake was not discovered till the date of the application for a continuance . *Held,* that the overruling of the application on the ground that it did not show sufficient diligence, did not show such abuse of the trial court's discretion as to justify a reversal of the judgment, the case having been once continued and then set down for trial on a day certain of an adjourned term.

4. ——: ——: ——: MATERIALITY. Even where the desired testimony is material, and in all probability true, the Supreme Court will reverse the judgment on the ground that the trial court refused to grant a continuance because of the absence of the witness, *only* when the evidence adduced at the trial impresses the Supreme Court with the conviction, not only that the defendant may have been prejudiced in his rights by the denial of such continuance, but that it is reasonably probable that if the absent witness had been present and testified a different verdict might have been reached.

5. ——: ——: ——: ——: STATEMENT IN APPLICATION. Where the statements set out in an application for a continuance could have been received as evidence only for the purpose of showing that the homicide was committed in self-defense, the application should state that the defendant intended to rely upon that defense.

6. ——: EVIDENCE: STATE'S WITNESS: CONVERSATION WITH STRANGERS. Where a State's witness is questioned on cross-examination concerning a conversation he had with a third party, it is proper to permit him to state, on re-direct examination by the State, what he in fact said to such witness or in his presence.

7. ——: ——: VAGUE THREATS. Shortly before, on the same day of the homicide, defendant stated he would "kill somebody before the week was out" and he would "like to kill some damned old Grand Army man." The deceased was not a Grand Army man. *Held* that the statements could not have been ruled out as too general and as not against any particular person, since the remarks showed a revengeful and malicious spirit, and it was for the jury to determine whether or not they had any reference to the deceased.

8. ——: INSTRUCTIONS: MANSLAUGHTER: MURDER IN SECOND DE-
GREE. Where the facts of the case show that the crime is either
murder in the first degree, or nothing, no instructions for murder
in the second or manslaughter in the fourth degree should be
given.

9. ——: ——: STATE'S IMPERFECT INSTRUCTION. An imperfect
instruction on the part of the State on the subject of reasonable
doubt, may be cured by being taken in connection with one on the
same subject given for defendant.

*Appeal from Harrison Circuit Court.*—HON. P. C. STEPP,
Judge.

AFFIRMED.

SALLEE & CROSSAN and J. C. WILSON for appellant.

(1) The court committed a manifest error in over-
ruling defendant's application for a continuance. It will
be conceded that in its formal parts the application was
sufficient, and it only remains to be considered whether
proper diligence had been used, and whether the testimony
of the absent witness as set out in the application was
material. (2) To cite authorities to show the materiality
of this evidence would seem to be unnecessary, for they are
almost innumerable. State v. Sloan, 47 Mo. 604; State v.
Keene, 50 Mo. 357; State v. Elkins, 63 Mo. 159; State v.
Eaton, 75 Mo. 586; State v. Harrod, 102 Mo. 590. (3) If
under all the circumstances the continuance should have
been granted, it is ground for the reversal of the judgment.
State v. Tatlow, 136 Mo. 682; State v. Maddox, 117 Mo.
667; State v. Anderson, 96 Mo. 241; State v. Warden, 94
Mo. 648. In the case at bar the discretion of the court was
oppressively exercised. So far as is disclosed by the record,
this was defendant's first application for a postponement
of the trial, and no disposition was shown to unreasonably
delay the trial of the case. The application was filed on
the eleventh day of April, 1898, at the adjourned term held

on that date. This court will take judicial notice of the general law which provides that a regular term of the Harrison circuit court shall be held on the second Monday in May. (4) When the witness Briant denied making the statement to Champlain attributed to him there thus ended the matter. The defendant had not introduced such a part of a conversation as entitled the State to the remainder of it, and the witness' statement as to what he told Champlain was the purest hearsay and the court committed error in permitting it to be introduced. (5) The court committed error in permitting the witness Bain upon his direct examination by the State to testify that defendant told him on their way home from Ridgeway that he would kill somebody before the week was out, and particularly "that he would like to kill some damned old Grand Army man." The first threat if made was not directed against anyone in particular, and had no tendency to show the state of defendant's feelings toward the deceased. Its natural effect was to prejudice the jury against the defendant by showing him to be a man generally regardless of human life. State v. Goetz, 34 Mo. 85; State v. Daubert, 42 Mo. 242; State v. Crabtree, 111 Mo. 136; State v. Grant, 79 Mo. 137. (6) The court erred in refusing his request that the court instruct the jury upon the subject of murder in the second degree, and on manslaughter in the second and fourth degrees, and upon imperfect self-defense. State v. Foster, 61 Mo. 549; State v. Fairlamb, 121 Mo. 137; State v. Holmes, 54 Mo. 153; State v. Frazier, 137 Mo. 317. The evidence in this case shows that the defendant entertained hostile feelings toward the deceased on account of the alleged mistreatment by deceased of defendant's aunt. The court, by its course in refusing any instructions for a lower grade of offense than murder in the first degree, in effect told the jury to disregard all evidence of palliating circumstances testified to by defendant. The question as to the state of defendant's mind

caused by his injuries received in the combat with Stan-brough should have been submitted to the jury. State v. Holme, 54 Mo. 153; State v. Foster, 61 Mo. 549; State v. Hill, 69 Mo. 451; State v. Ellis, 74 Mo. 207; State v. Lewis, 74 Mo. 222; State v. Wilson, 98 Mo. 440; State v. Woods, 97 Mo. 31; State v. Swanagan, 109 Mo. 233; State v. Craw-ford, 115 Mo. 620; State v. Lewis, 118 Mo. 79; State v. Fairlamb, 121 Mo. 137; State v. Frazier, 137 Mo. 317; State v. Hudson, 59 Mo. 135; State v. Hardy, 95 Mo. 455; State v. Ramsay, 82 Mo. 138; State v. Jones, 79 Mo. 441. (7) The defendant testified, and he had the right to in-structions based upon his own testimony, that he went to Briant's place for the sole purpose of chastising deceased with a buggy whip, because he had whipped his wife with a blacksnake whip. This purpose was unlawful, but not felonious, for an ordinary whip such as described by witness Bain is not a deadly or dangerous weapon. Having volun-tarily entered the difficulty for an unlawful purpose, he could not be completely exonerated when his peril became im-minent, but his shooting under these circumstances consti-tuted an offense less than murder in the first degree. State v. Partlow, 90 Mo. 608; State v. Berkley, 92 Mo. 53; State v. Davidson, 95 Mo. 158; State v. Gilmore, 95 Mo. 554; State v. Parker, 96 Mo. 382; State v. Stiltz, 97 Mo. 25; State v. Herrell, 97 Mo. 110; State v. Hicks, 92 Mo. 438. (8) Defendant should have had his theory of the case as shown by his own testimony fully and fairly submitted to the jury, as per his written request, and the failure of the court to do so is reversible error. State v. Brown, 104 Mo. 372; State v. Banks, 73 Mo. 592; State v. Palmer, 88 Mo. 568; State v. Partlow, 90 Mo. 608; State v. Young, 99 Mo. 666. These instructions can only be denied where the phys-ical facts and the uncontroverted acts of defendant con-clusively contradict his testimony. State v. Talmage, 107 Mo. 543. The jury should have been instructed as to man-

slaughter in the fourth degree.    State v. Stiltz, 97 Mo. 25; State v. Cable, 117 Mo. 380.

EDWARD C. CROW, Attorney-General, J. W. PEERY and E. H. FRISBY, for the State.

(1)    No error was committed in overruling the application for continuance for these reasons:    *First.*    It discloses no diligence.    State v. Whitton, 68 Mo. 91; Blair v. Railroad, 89 Mo. 383; State v. Emery, 12 Mo. App. 583; State v. Pagels, 92 Mo. 308; State v. Inks, 135 Mo. 678; State v. Good, 132 Mo. 114; State v. Banks, 118 Mo. 117; State v. Riney, 137 Mo. 102.    *Second.*    The application shows upon its face that the failure to have a subpoena issued for the witness resulted from the mistake or negligence of the defendant or his counsel.    In either event the courts will not relieve against such mistake or negligence. ·Gehrke v. Jod, 59 Mo. 522; Bubinger v. Taylor, 64 Mo. 63; State v. Dreher, 137 Mo. 11.    *Third.*    The application failed to show the relevancy or materiality of the alleged evidence of the absent witness, because it failed to state that the defendant expected to rely upon the defense of self-defense, upon which ground only the alleged threats would be admissible.    State v. Pagels, 92 Mo. 300; State v. Howell, 117 Mo. 307; 1 Bish., Crim. Proc., sec. 951a; State v. Mitchell, 98 Mo. 657. . (2)    Upon no possible theory could the evidence that deceased had whipped his wife four or five weeks before the homicide, or that defendant had been informed that such was the fact, be admissible upon his trial, for wantonly and wickedly attacking an unarmed man. It could neither excuse nor palliate the offense disclosed by this record.    State v. Anderson, 98 Mo. 461; State v. Bulling, 105 Mo. 204.    (3)    The evidence of David Bain that defendant said, within an hour of the homicide, that he

intended to kill someone before the end of the week, and also
that he intended to kill some damned old Grand Army man,
was entirely competent.     General threats are always admis-
sible on the trial of one charged with murder.     State v.
Fitzgerald, 130 Mo. 407; State v. Harlan, 130 Mo. 381;
State v. Guy, 69 Mo. 430.     (4)   The court did not err in
refusing to instruct on any lower degree of homicide than
murder in the first degree.     The evidence for the State
discloses a most cowardly murder, accompanied by circum-
stances of great brutality and atrocity.     Under the circum-
stances shown in evidence, the defendant was not entitled
to any instructions for a lower grade than murder in the
first degree.     State v. Inks, 135 Mo. 678; State v. Williams,
141 Mo. 316; State v. Pollard, 139 Mo. 220; State v. Brown,
119 Mo. 527; State v. Sneed, 91 Mo. 552; State v. Reed, 117
Mo. 604; State v. Smith, 114 Mo. 421; State v. Umble, 115
Mo. 464.     (5)   No error was committed in refusing to in-
struct on manslaughter in the fourth degree, on the theory
that defendant might have entered into the combat at the
wagon near the barn without felonious intent.     The deceased
was not shot and killed in that combat.   It was a half hour or
longer since it had ceased, and they had made friends and
shaken hands and gone to the house to wash away its stains
in apparent good fellowship.     The killing did not occur "dur-
ing the progress of that difficulty brought on by the defend-
ant."

BURGESS, J.—The defendant was indicted on the
fourth day of October, 1897, for having on the seventeenth
day of August, 1897, at the county of Harrison, shot, killed
and murdered one George Stanbrough.     He was convicted
of murder in the first degree, and his punishment fixed at
death.   He appeals.

The indictment was found in the Harrison circuit court,
at its October term, 1897.     At that term the case was con-
tinued until the January term, 1898, when the court was

adjourned until the eleventh day of April next following, and the case set down for the trial at that time.

When the case was called for trial defendant applied for a continuance alleging as grounds therefor the absence of one Simeon Richardson, a resident of Harrison county, but who was then temporarily absent from the State.   That he had first learned of the absence of this witness on the day of making his application; that when he gave the list of witnesses to his counsel, he designated this witness as Scott Richardson's largest boy, and that his attorneys by mistake caused a subpoena to be issued for George Richardson, Scott Richardson's oldest son, who was not the party wanted. They understood by the term largest boy that he wanted the oldest son of Scott Richardson, and had him summoned accordingly.   That he first learned of the mistake on the day of making his said application.   That said Simeon Richardson is a boy of about eighteen years of age, and resides with his father near Cainsville, Harrison county, Missouri, and near the residences of George Stanbrough, the deceased, and his father and brothers; that said Simeon Richardson resided in that neighborhood until the sixteenth day of March, 1898; that in the latter part of February, 1898, and while Scott Richardson, the father of said Simeon, was absent from home, one Nelson Stanbrough, a brother of deceased George Stanbrough, came to the home of said Simeon Richardson, and persuaded him to leave home and go to Spearfish, South Dakota, furnishing him car fare and money to pay expenses, said Nelson Stanbrough accompanying him. That this was done by said Nelson Stanbrough to prevent the said Simeon Richardson from testifying in this cause on behalf of defendants, he, the said Nelson Stanbrough, being well aware of the date fixed for the trial of the cause. That the said Simeon Richardson, if present in court, would testify that in the early part of August, 1897, and about a week before the killing of George Stanbrough, said George

Stanbrough told said Simeon while visiting at the house of deceased near Blythedale, Harrison county, Missouri, that if he went to the picnic at Blythedale, he said Free Cochran would get into trouble, because he intended to kill Free Cochran at the first opportunity, and that he didn't want to kill him at the picnic because there would be too large a crowd; but that he wanted to get him out somewhere so he would be sure to get him.      That said picnic referred to was held near Blythedale in the early part of August, 1897; that the witness, Simeon Richardson, came and informed the defendant of the above statements and threats made to him by said George Stanbrough, and that defendant did not attend said picnic for fear of having trouble with said George Stanbrough.

The application was overruled and defendant saved exceptions.

The wife of deceased Stanbrough was a half-sister to the mother of defendant.      Stanbrough and defendant both lived in the same neighborhood.      John Briant, at whose house the homicide was committed, married a twin sister of the wife of Stanbrough.      All of these parties resided within six or seven miles of Ridgeway in said county.

On the seventeenth day of August, 1897, the defendant went to Ridgeway with one of his neighbors, one David Bain, they riding together in Bain's wagon.      While there defendant became partially intoxicated, and while on their return home, they met Stanbrough, who was driving a team and wagon, in the road near the residence of defendant.

As the teams approached each other, the defendant who had Bain's buggy whip in his hand, remarked to Stanbrough, who also had a whip in his hand, "You son-of-a-bitch, is that the whip you whipped my aunt with," and attempted to strike him with the buggy whip.      When Bain and defendant arrived at the place where defendant left the public road to go to his own house, he took with him against Bain's protest

his buggy whip, and said to him that he was going home and get his shotgun, and go down to the house of Briant to which they understood Stanbrough had gone, and whip him, Stanbrough, with the whip, and if he resisted he would blow his damned brains out.

Defendant then went home, got his shotgun, took it and the whip and went to the house of Briant, where Stanbrough was. When he got there, Stanbrough, Briant, and his wife and two small children were at Briant's hog lot, loading some hogs in a wagon. Stanbrough was up in the wagon, the team being detached therefrom. He said to Stanbrough, "George, you damned son-of-a-bitch, you black-snaked my aunt with a blacksnake, and I am going to wear this out on you," and began striking him with the buggy whip. He struck the deceased several times with the whip, when deceased reached down to get a whip that was in the wagon, but defendant drew his gun upon him and told him to drop it and fired a shot over his head. About this time deceased got out of the wagon, when defendant again struck him with the whip. Deceased then asked defendant to give him a fair show, which he finally agreed to do, but still kept his gun in his hand. As they stepped off a few steps to the spot where they were to fight, defendant picked up an old single tree with which he struck deceased upon the back of the neck, or upon the shoulders. The deceased thereupon took the single tree from defendant and hit him a blow over the head with it.

In the meantime, Briant was trying to take the remaining cartridge out of the gun, but being unable to do so he fired it off. By this time deceased had defendant down, was on top of, and choking him. Defendant began to call for help and Briant separated them. Defendant then asked deceased to shake hands, and they did so. He then took a seat upon the door of an out house, near by, and the parties

all remained there for fifteen or twenty minutes, when Briant suggested to them that they go to the house and wash their hands and faces. Defendant then proposed to deceased that they go to the house and wash. On the way to the house defendant, said to Briant: "I wish to the Lord you hadn't shot that load out; that was the last shell I had." When they reached the house defendant went in, followed by Briant. After Briant got into the house he stepped into the kitchen and picked up a box of loaded shells that were on the cupboard and hid them under it, and went on into the front room where defendant was. Deceased and Mrs. Briant remained outside on the platform or porch near the well. When defendant and Briant went into the house they went into the front room, defendant sat down upon a bed, and Briant who had the gun laid it upon the bed by defendant. Briant then withdrew from the room a few minutes, and upon his return he saw defendant going through the inside door into the kitchen, and almost instantly heard the report of the gun. During this time deceased and Mrs. Briant had remained at the well, and when defendant came to the outside door of the house with his gun cocked deceased was standing with his back to him, but turned his head partially around, and as he did so defendant fired, the shot taking effect in the back of his head producing almost instant death. About the time he fell defendant remarked: "Damn him, I'll give him a second one," and fired another shot into his side.

Immediately after the killing, defendant picked up a piece of iron and a hoe which were in the yard and placed them by the side of the dead body, at the same time telling Briant and his wife that they must swear that the deceased was coming at him with them, and that he shot him in self-defense. He then proposed to throw the body in a ditch and cover it up, and to throw it in an old well on the farm, but Briant and his wife declined to assist him in so doing and

finally dissuaded him from so doing. He then wanted to search the body for money, but was dissuaded from doing this also.

Upon the trial the defendant admitted that he took the whip and his shotgun and went to the house of Briant for the purpose of whipping the deceased. He denied, however, that he intended to kill him, but admitted that he had taken his gun along as a precaution or protection against the deceased. He admitted that he had his gun cocked while he was whipping the deceased at the wagon. He testified that as he went into the kitchen door of Briant's house, after the fight down at the barn, he reached upon the cupboard and took two cartridges out of the box belonging to Briant, and that he held them in his closed hand during the fifteen minutes Mr. and Mrs. Briant say they were in the house. He claimed that he became suspicious of the actions of Briant and his wife, and seeing his gun lying on the bed he loaded it and started outside to the door; though before he could see either Mrs. Briant or the deceased, Stanbrough, he cocked his gun and held it in readiness; that when he got to the door he saw the deceased and said, "Get from here, you son-of-a-bitch;" that the deceased picked up the bar of iron and started toward him, and that he fired the shot. He claims that he was looking the deceased straight in the eye; that they were face to face, and when asked how it was that he shot the back of his head off, he said the deceased turned his head.

The court instructed the jury upon murder in the first degree and self-defense, and refused to instruct upon any lower grade of homicide.

It is first claimed that the court committed error in overruling defendant's application for a continuance. It is conceded by defendant, however, that this depends upon whether proper diligence was used by him in order to procure the attendance of the witness on account of whose absence the continuance was applied for,

and whether the facts stated in the application that he would testify to, if present, were material. It may be stated in the outset that matters of continuance rest largely within the discretion of the trial court, and that unless it be made to appear that such discretion has been unwisely exercised this court will not interfere. [State v. Maddox, 117 Mo. 667; State v. Tatlow, 136 Mo. 678; State v. Banks, 118 Mo. 117; State v. Riney, 137 Mo. 102.]

The presumption is in favor of the ruling of the court, and in order to convict it of error it devolves upon the party complaining to show that the application for the continuance was improperly overruled, and that his rights have been prejudiced by reason thereof. When the facts are considered it can not be said that there was such an abuse of discretion in overruling the application on the ground of the want of the exercise of proper diligence in procuring the attendance of the absent witness as would justify a reversal of the judgment upon that ground.

With respect to the next proposition, that is the materiality of the facts that the absent witness would testify to if present, it may be said that it is not in every case, even where the desired testimony is material and in all probability true, that this court will reverse the judgment of the trial court upon the ground of its refusal to grant a continuance because of the absence and want of such testimony. It is only in case that the evidence adduced at the trial would impress this court with the conviction, not merely that the defendant might have in all probability been prejudiced in his rights by the denial of such continuance, but that it was reasonably probable that if the absent witness had been present and testified before the jury a different result would have been reached by them.

Moreover, "It is not sufficient to aver that the testimony sought will be material. Of that the court must

judge, and facts enough must be stated to show the connection between the testimony sought, and the case to be tried." [Hubbard v. State, 7 Ind. 164; Moody v. People, 20 Ill. 315; Steele v. People, 45 Ill. 152; State v. Pagels, 92 Mo. 308; State v. Mitchell, 98 Mo. 657; McLean v. State, 28 Kan. 372; State v. Clark, 37 La. Ann. 128; Adams v. People, 109 Ill. 444; State v. Kindred, 148 Mo.—.]

If the absent witness had been present at the trial his evidence could only have been received for the purpose of showing that the shooting was done in self-defense, and no intimation or statement is made in the application that the defendant relied upon, or that he expected to justify the killing upon any such ground.

It is insisted that the court erred in permitting Briant who was a witness for the State to testify over the objection of defendant as to what he said in a conversation with one Champlain in regard to the rencounter between defendant and deceased. The witness had previously been asked upon his cross-examination with respect to this same matter, and no error was committed by permitting him when on redirect examination by the State, to state what he did in fact say to or in the presence of Champlain.

The State was permitted to prove over the objection of defendant that on the day of the homicide and before its commission while returning from Ridgeway, defendant said he would kill somebody before the week was out, and that he would "like to kill some damned old Grand Army man." The remarks though general, were we think admissible against defendant as a threat and as showing a revengeful and malicious spirit. The fact that deceased was not a Grand Army man and defendant after he had said he would "like to kill somebody before the week was out," also remarked that he would "like to kill some damned old Grand Army man," did not necessarily render the statements inadmissible upon the ground that they were too general or had

no reference to deceased, as the question to whom he had reference was for the consideration of the jury. "Vague threats, not against any particular person, have often been admitted, and are competent evidence." [State v. Grant, 79 Mo. 137; Rex v. Barbot, 18 State Trials, 1251; Benedict v. State, 14 Wis. 423.]

In Hopkins v. Commonwealth, 50 Pa. St. 9, it was said: "Threats made by a prisoner within an hour before the commission of the murder, that 'he would kill somebody before twenty-four hours', are evidence of malice prepense, though they did not expressly refer to the deceased, and if he killed anybody in pursuance of such malice it was murder in the first degree." See, also, State v. Hoyt, 47 Conn. 518.

The point is also made that error was committed in permitting Briant and his wife to testify as to what they said and did after defendant left the scene of the homicide. The record shows that what they said was excluded by the court, and their acts recently after the homicide, while perhaps inadmissible, could not in any way have prejudiced the rights of defendant, and the judgment should not be reversed upon that ground alone.

It is also insisted that error was committed in excluding evidence offered by defendant that deceased four or five weeks before the homicide had whipped his wife, or that defendant had been informed that he had done so, but we are unable to conceive upon what theory of the case such evidence was admissible, and none has been suggested by counsel for defendant.

It is further insisted that the court erred in refusing to instruct the jury for murder in the second degree, manslaughter in the second and fourth degrees, and imperfect self-defense, but we have looked in vain through the record for something upon which to predicate this contention. The facts show that the offense was either murder in the first

degree or nothing.   There was neither murder in the second degree nor manslaughter in any degree.

If after defendant and deceased had agreed to fight, and during the conflict one of them had killed the other without any unfair advantage being taken or deadly weapon being used, he would have been guilty of nothing more than manslaughter.   [State v. Partlow, 90 Mo. 608, and authorities cited; People v. Sanchez, 24 Cal. 17.]

But in this case, after the defendant had pretended to make friends with the deceased, and they had gone to the house and washed their hands and faces, defendant, while Briant was unfortunately absent from the room in which they had been, arose from the bed upon which they had been sitting, placed two loaded shells in his gun which he ? :d taken from the cupboard, cocked it, and went stealthily to the door near the well where deceased was standing, and without a moment's warning fired one load into his head, at close range, causing him to pitch forward upon his face upon the ground, and then fired the contents of the other barrel into his prostrate body, causing instant death.

There was no error in refusing instructions asked by the defendant, nor in giving instructions on the part of the State, as those which were given presented every phase of the case very fairly to the jury.   The State's tenth and twelfth instructions are especially criticised by defendant. It is argued that the tenth withdrew from the consideration of the jury the defendant's rights of imperfect self-defense, and is erroneous in not requiring the existence of the elements constituting murder in the first degree to be established beyond a reasonable doubt.   When this instruction is taken in connection with the State's third instruction by which the jury were told that the law presumes the defendant innocent of any offense, and this presumption continues throughout the case until overcome by the evidence showing him guilty beyond a reasonable doubt, and if upon the whole

case you have a reasonable doubt of defendant's guilt you must acquit, it is removed from the objection urged against it [State v. Hunt, 141 Mo. 626], and there is nothing in State v. Frazier, 137 Mo. 317, which in the least militates against this view.

The criticism on the State's twelfth instruction is wholly without merit.

A final contention is that the indictment is fatally defective in that it wholly fails to charge any offense in a logical or intelligible manner, but we are unable to concur in this position. It is true that it does not indicate the highest degree of skill, but it contains all averments essential to make a good indictment for murder in the first degree.

Finding no reversible error in the record, we affirm the judgment, and direct the sentence to be executed.

GANTT, P. J., and SHERWOOD, J., concur.