STATE v. GRACE FERGUSON, Appellant.—No. 38857.—182 S. W. (2d) 38.

Division Two, June 5, 1944.

Rehearing Denied, September 5, 1944.

(46)

*Roy Coyne* and *Ray Bond* for appellant.

48

*Roy McKittrick,* Attorney General, *L. I. Morris* and *Gaylord Wilkins,* Assistant Attorneys General, for respondent.

BARRETT, C.—In killing her husband, William Ferguson, the jury found that Grace Ferguson was guilty of murder in the second degree and assessed her punishment at ten years in the penitentiary. On this appeal she concedes that there was evidence from which the jury could find her guilty of murder in the second degree. But she contends that there was also evidence, both from the state's witnesses

and from her own testimony, from which the jury could have found her guilty of manslaughter on which the court did not charge the jury and that thus she was deprived of the right to have the jury say and find whether she was guilty of the lesser offense. State v. Creighton, 330 Mo. 1176, 52 S. W. (2d), 556.

The appellant and the deceased had been married for thirty years and the appellant's evidence tends to show that their life as husband and wife had been rather turbulent and unhappy. There was evidence that he had threatened to kill her. To demonstrate manslaughter the appellant points to the events of their life as husband and wife as forming the background for her mental state with reference to her husband. She then stresses her testimony that her husband had come to her room several times during the night, turned on the lights and stood staring at her, as he frequently did. Finally when she requested him to turn out the lights and go to bed he said: "Well, I could sleep better if I could kill you. God-damn you, this is one time I will get you." Then, (using the facts as she relates them in her argument) she says her husband ran from the room "and came back almost immediately with a stick in each hand, and was approaching the defendant, who had slipped down in the bed, 'and he looked very mad, . . . he was awfully nervous and his eyes looked glassy and he looked just like a mad man.' It was at that point, while the deceased was coming nearer to her with the upraised sticks that the defendant fired the first shot. The deceased immediately turned and went to the kitchen, and then instantly turned back to the bedroom, holding both of the sticks in both hands, in a crouching position, and approached the defendant with the sticks upraised, preparatory to striking her. It was at this point that the fatal shot was fired."

 The appellant contends that these events and facts, the repeated threats, the conduct and appearance of her husband, the insulting, threatening words and his menacing and threatening attitude which occurred in but a few seconds did not leave time for thought. It is her contention that these facts may have aroused a "heat of passion" or an impulse and an intentional homicide but, she says, they dispel *malice*, the existence or nonexistence of which determines whether the homicide is second degree or manslaughter. State v. Gadwood, 342 Mo. 466, 116 S. W. (2d) 42; State v. Conley, 255 Mo. 185, 164 S. W. 193; State v. Carey & Kerr, 313 Mo. 436, 282 S. W. 22; 40 C. J. S., Secs. 35b, 37, 45. The first and insurmountable difficulty with the appellant's contention is that she does not say that her husband struck her, on the contrary, putting the facts as favorably as she states them, she says he approached her with the sticks upraised preparatory to striking her when she fired the fatal shot. These facts may have entitled her to an instruction on self-defense and an acquittal if true, as the court charged, but they are not

enough in and of themselves to reduce the grade and degree of the homicide to manslaughter. We are definitely committed to the view that the provocation necessary to reduce the offense to manslaughter must consist of actual violence to the person. Opprobrious and threatening words accompanied by threatening gestures do not reduce the grade of the homicide—nothing short of an actual battery permits the inference of provocation and passion reducing the offense to manslaughter. State v. Biswell, 352 Mo. 698, 179 S. W. (2d) 61; State v. Bongard, 330 Mo. 805, 51 S. W. (2d) 84; State v. Creighton, 330 Mo. 1176, 52 S. W. (2d) 556. In so far as State v. Garrison, 147 Mo. 548, 49 S. W. 508 and State v. Howard, 102 Mo. 142, 14 S. W. 937 announced a contrary doctrine they have been overruled by the above cases. And State v. Grugin, 147 Mo. 39, 47 S. W. 1058, is expressly distinguished in the Biswell case. State v. Conley, 255 Mo. 185, 164 S. W. 193, but serves to illustrate the proper rule as there was an actual battery by the deceased, hence a killing in a heat of passion, a reasonable provocation and without malice, as the jury could find.

To demonstrate her second theory of manslaughter the appellant again relates her version of the shooting, adding some facts and changing the emphasis on certain events. After her husband threatened to kill her he left the room and she thought he had gone to get a gun " 'but when he came back, as I heard him coming back I slipped to the foot of the bed and over towards the west side.' That when the deceased came back in to the bedroom, he had two sticks, one in each hand, 'and was coming towards me, and he looked very mad, . . . he was awfully nervous and his eyes looked glassy and he looked just like a mad man.' The defendant slipped her gun out from under the pillow, and said: 'Don't come any closer or I will shoot you.' That the deceased kept on coming towards the defendant, and holding the pistol in both of her hands, she fired; that she did not shoot to hit him; that deceased 'kind of dodged down and ran back into the kitchen, and immediately turned around and started to come back into the bedroom'; that as he came back 'he had both of the sticks in both hands, and he would dodge down, and then as he came towards me I had stepped out of bed and he had leaned forward like this (indicating) with his right hand to strike.' The defendant said: 'Don't come any closer, or I will shoot you'; that, as the deceased leaned over to strike the defendant, she shot, because 'I knew he would kill me.' "

Following the homicide the appellant was questioned by the prosecuting attorneys and by the police and they as well as others who were present testified to her admissions and statements. In connection with the appellant's version of the occurrence she particularly stresses the testimony of Mrs. Tonnies, the record clerk at the police station:

"Q. Do you remember the position Mrs. Ferguson said she was in when she fired the second shot and the fatal shot—the second shot which was the fatal shot?

A. [41] She said she got up and followed him, and he turned around and came back.

"Q. Where did she follow him to? A. To the kitchen.

"Q. Into the kitchen? A. Yes, sir.

"Q. Go ahead and tell what she said. A. Well, she followed him towards the kitchen and she said he was just inside the door, or she was just inside when she fired the last time.

"Q. She followed him out of her bedroom towards the kitchen? A. Yes, sir."

Furthermore, the appellant was cross-examined along the same line and especially with reference to what she had said at the police station with reference to following her husband after the first shot.

The appellant says that these facts entitled her to an instruction permitting the jury to find her guilty of manslaughter "if they found from the evidence that following the firing of the first shot, the defendant, instead of retreating to a place of safety, went towards the door through which the deceased had immediately prior thereto left the room, without felonious intent, and if the jury find by so doing, the defendant had from a legal standpoint assumed the role of the aggressor, and if the jury should further find that it thereafter became necessary for the defendant to shoot the deceased to prevent him from killing her or inflicting great bodily injury to her." It is her contention that these facts and the suggested instruction hypothesize the so-called right of "imperfect self-defense" which, if found, would reduce the homicide to manslaughter. In substance, she puts her contention in this language: "if one who has been attacked and thereafter abandons the role of defender and becomes an aggressor and renews the controversy with felonious intent, such party is thereby deprived of the right of self-defense; but if, after being attacked, a party returns to the place of conflict or follows the attacker, without any felonious intent, then, although the party is deprived of the right of 'perfect self-defense,' he does have the right of imperfect self-defense, which reduces the offense to manslaughter."

It is doubtful that this doctrine with the paradoxical name, "imperfect self-defense," means any more in the law of homicide than that if there is evidence showing or from which the jury could find a lack of *malice* on the part of the accused he is entitled to an instruction on manslaughter. State v. Rennison, 306 Mo. 473, 267 S. W. 850; Wallace v. U. S., 162 U. S. 466, 471, 16 S. Ct. 859, 40 L. Ed. 1039. The doctrine originated in State v. Partlow, 90 Mo. 608, 4 S. W. 14 and the court, in that case, after announcing the rule and discussing the evidence said: "From this testimony it will readily be seen that, taking that testimony as true, *no malicious purpose prompted*

*the defendant,* even if it be held that he 'brought on the difficulty.'' But regardless of that and regardless of whether under any view of the evidence and the circumstances in this case the appellant could be considered the aggressor or as voluntarily entering a difficulty (State v. Roberts, 280 Mo. 669, 217 S. W. 988; State v. Gordon, 191 Mo. 114, 89 S. W. 1025), we do not think she can possibly come within the rule. Under all the cases she must have entered or renewed the conflict ''without intent to commit a felony,'' or ''some unlawful purpose short of an intended felony,'' or for some purpose ''not felonious.'' State v. Reeves (Mo.), 195 S. W. 1027; State v. Kretschmar, 232 Mo. 29, 133 S. W. 16; State v. Harlan (Mo.), 240 S. W. 197. In this case the appellant had a pistol under her pillow and if she started the conflict or renewed it she did so with a pistol which she fired twice and consequently she was not without ''felonious intent'' (State v. Williams, 337 Mo. 884, 893, 87 S. W. (2d) 175; State v. Painter, 329 Mo. 314, 325, 44 S. W. (2d) 79, 83) and did not renew or bring on the difficulty ''with some unlawful purpose short of an intended felony.'' State v. Biswell, supra. She was either guilty of murder or entitled to an acquittal by reason of being compelled to act in self-defense. State v. Zorn, 202 Mo. 12, 100 S. W. 591; State v. Biswell, supra; State v. Cochran, 147 Mo. 504, 49 S. W. 558.

The appellant testified and offered evidence with reference to her reputation as well. In rebuttal of her reputation evidence the state proved by several witnesses that her reputation for ''general morality'' was bad. The appellant contends that it was error for the court to admit evidence of her reputation for ''general morality'' because such evidence must have been confined, by both parties, to traits of character involved in the offense for which she was being tried or to her reputation for truth and veracity which would reflect on her credibility as a witness. There can be no question but that both parties should confine their reputation evidence to traits of character involved in the offense charged. State v. Anslinger, 171 Mo. 600, 71 S. W. 1041; State v. Quinn, 344 Mo. 1072, 130 S. W. (2d) 511; 22 C. J. S., Sec. 677e, p. 1074. Furthermore, we have repudiated the so-called ''morality rule'' when the defendant testifies but does not offer evidence in support of his reputation. In such instances the state may not attack the defendant's reputation or impeach him except as to his reputation for truth and veracity, as that reflects on his credibility as a witness. State v. Williams, 337 Mo. 884, 87 S. W. (2d) 175, 100 A. L. R. 1503; State v. Scott, 332 Mo. 255, 58 S. W. (2d) 275, 90 A. L. R. 860. Also, the defendant does not waive the state's assailment of his reputation for a trait not involved in the offense by offering rebuttal evidence of the same nature when he did not put the trait in issue in the first instance. State v. Beckner, 194 Mo. 281, 91 S. W. 892, 3 L. R. A. (N. S.) 535.

54

But these cases do not solve the problem presented by this appeal. Here the appellant offered two witnesses to her good reputation for being a peaceful, law-abiding citizen. But her first reputation witness was asked about and testified that "her general reputation in the community there in which she lives for being a truthful, *honest upright woman*" was good. On cross-examination the following occurred:

"Q. What do you mean by 'upright,' Mr. Draeger? A. How is that? Q. What do you mean, you said she is an upright woman? A. I just meant she was a good woman, paid her bills and tended to her own business. Q. She paid her bills, is that right? A. Yes, sir. Q. *Did you mean she was a moral woman?* A. *So far as I know.* Q. Well, you stated her reputation was good? A. So far as I know."

The appellant says that "uprightness" and "honesty" were not traits of character involved in the offense and for that reason the evidence was probably not admissible but that it was admitted without objection on the part of the state, therefore, she says, it is not necessary to decide whether this testimony "opened the door for the State to attack the defendant's reputation for the specific traits of character of honesty and uprightness."

With this we cannot agree. The basis of excluding reputation evidence of traits not involved in the offense is the policy of avoiding uncontrollable, undue prejudice and unjust condemnation which such evidence might induce. 1 Wigmore, Evidence, Sec. 57, p. 454. But in this case can it be said, in view of the witness' own definition of "upright" and his evidence that she was an "honest" woman, that these traits and her general morality were not involved and in issue? Or that she thought they were involved and in issue and offered the evidence accordingly? As motives for killing her husband there was evidence from which the jury could find that she was more than friendly with another man (State v. Duestrow, 137 Mo. 44, 38 S. W. 554; 40 C. J. S., Sec. 229), they had talked about a divorce and had engaged in heated arguments over the division of their property and he had $6,500.00 in life insurance. State v. Hancock, 340 Mo. 918, 104 S. W. (2d) 241; 40 C. J. S., Secs. 234, 235. With this as a background should she have been deprived of the right to show that she was an "honest," "upright," "moral" woman? If she should not the traits in question were involved and after she offered evidence of her good character in those respects the state was entitled to offer evidence to the contrary.

During the progress of the trial, on the second night, and before the cause was submitted to the jury, the jury attended a moving picture show in Carthage and because of that fact the appellant insists that she is entitled to a new trial. It is not claimed that the jury was permitted to separate (Mo. R. S. A., Secs. 4071, 4072; State v. Shawley, 334 Mo. 352, 67 S. W. (2d) 74) nor that there was an

opportunity for misconduct after the case was submitted to the jury. State v. Asbury, 327 Mo. 180, 36 S. W. (2d) 919. But it is urged that the state failed to sustain its burden of affirmatively showing that the jurors were not subjected to any improper influence. State v. Schlie, 350 Mo. 924, 169 S. W. (2d) 348; Mo. R. S. A., Sec. 4124.

The circumstances under which the jury was permitted to attend the show were related by the trial judge. ''On the evening of June 22nd which was the second evening of the trial of this case after adjournment, as I recall the elevator was out of order, and I was walking down from the third floor, and as I passed the second floor the Sheriff stopped me and told me some of the jurors wanted to be taken to the picture show that night. He had the jury in custody there at that place and I told the Sheriff at that time that the courts did not look with favor upon the taking of jurors to the picture show or other public gatherings. I was familiar with the case of State versus Dodson, and I recall the statement made in that case by the Supreme Court. One or two of the jurors said it was so terribly hot up there in that hotel where we are being kept and nothing to do for such a long evening, it is almost unbearable, and we would be a whole lot better off if we could be taken to a picture show where it is cooler. I then told the Sheriff that the only way I would consent for the jury being taken to the picture show would be that he could make arrangements for the seating of that jury where they would not be thrown in contact with the general public; would not have to enter the picture show by being mixed and mingled with the public generally, and if he could make arrangements to take the jury to the picture show under those circumstances it would be agreeable to the Court. So that if there is any error in the taking of the jury to the picture show it rests squarely upon the Court and not with the Sheriff or any other official.''

Neither the defendant nor her counsel were present at the time, did not consent to the jury's attending the picture show and did not know of the fact until several days after the case was tried. The affidavit of the sheriff and the deputy sheriff who had charge of the jury and who accompanied them to the picture show (''Once Upon A Honeymoon,'' a humorous love story,) stated that the jury expressed a desire to go to the show because of the extreme heat in their quarters in the Crane Hotel. They say, in their affidavit, ''That said jury accompanied by said affiants occupied seven seats in each of two rows on the south side of the theatre. That in the back row there sat six jurors and deputy sheriff John Baine and that in the next row in front thereof sat George Tatum (the sheriff) and the other six jurors. *That only one person occupied the seats immediately behind the jury and there was no conversation between any member of the jury and any other person, save and except among the jury themselves and conversation with the sheriffs and nothing was said per-*

*taining to this said case.. No person spoke a word or came in close proximity with said jury while said jury was in said theatre and these affiants at all times kept a diligent watch to see that no one talked with or came close to said jury.* That said Tiger Theatre has in the center of the ceiling two separate clusters of yellow lights, which gives only a semi-darkness over the theatre and it was possible at all times to see the said jury and any and all other people in said theatre and said theatre at no time was dark.''

Two members of the jury were called as witnesses by the appellant on the hearing of the motion for a new trial. They testified to the jury's attendance of the show. One of them thought they all sat in one row of seats and the other thought they sat in two rows. One of them thought that no one sat closer to the jury than three or four rows. This one said that the sheriff caused an usher to have ''the seats cleared out before we went in.'' He said it was dark and he did not look back to see whether anyone sat behind them. As to the jury's talking to others in the show this witness said: ''No, I never seen anybody talk to anyone there; we all went in and sat down until the end of the show and then we all got up and marched out, and if there was any words said by anybody I never seen them. . . . I never saw a soul speak to any juror while we were in there.'' From this juror it was developed that the sheriff bought and paid for the tickets. The other juror said that they did not mix with other people as they went into the show and he did not see anyone talk to any member of the jury. He couldn't say how many people sat behind the jury because he did not pay any attention.

The appellant does not except to the fact of the sheriff's having custody of the jury but he was a witness for the state. The first shot fired by the appellant hit the west wall of the kitchen and one of the questions in the case was whether that shot could have been fired by the appellant as she sat on the bed as she testified. The sheriff examined the bedroom and kitchen and testified, as did several others, that ''From the position of the bed I could not see where the bullet could have been fired from a gun into the wall from the bed.'' The appellant in her argument says that she does not intend to suggest that the ▓▓▓ sheriff had any improper motive in taking the jurors to the picture show as his guests but insists that the fact that he did, in addition to his being a witness to a material fact, might unconsciously influence the jury. The appellant does not contend that there was any improper conduct on the part of the jury but says that under the circumstances there was ample opportunity for outside influence to have been brought to bear upon the jury during the motion picture.

As we have said, no point is made of the sheriff's having charge of the jury, and having them in charge he had or could have an opportunity to improperly influence them whether they went to a picture

show or not. Under the circumstances we cannot attach much import-ance to that fact alone. However, it was not proper for the sheriff to act as host to the jury in attending the show. That conduct cannot be condoned anymore than a jury's attending any public gathering can be condoned or recommended. State v. Dodson, 338 Mo. 846, 92 S. W. (2d) 614. But even so a new trial should not be granted if the state has sustained its burden of affirmatively showing no miscon-duct or improper influence. In State v. Jeffries, 210 Mo. 302, 109 S. W. 614, the jury attended a minstrel show during the progress of a murder trial. The sheriff, two deputies and every member of the jury panel testified that they sat in a section of the "opera house" to themselves and that no one communicated with any of them and they did not separate. The court said, l. c. 335-336: "While we think it was an irregularity that is not to be countenanced or approved, in view of the uncontradicted testimony on the subject showing the performance, a copy of the program of which is included in the record, to have been nothing more than a minstrel performance con-sisting of sentimental and comic songs, we are constrained to hold that the circuit court did not err in refusing to set aside the verdict on this ground." In State v. Schlie, supra, the state offered but "a single witness, a deputy sheriff" in rebuttal of the defendant's show-ing of the jury's separation and it was held that the state had not sustained its burden of affirmatively showing "that the jurors were not subjected to improper influence." In this instance we think the state has sufficiently discharged that burden, there being no charge of separation or of actual misconduct other than the fact of the jury's mere attendance of the picture show with the sheriff as host, by its showing that no one communicated with or had any contact with any member of the jury panel. State v. Orrick, 106 Mo. 111, 17 S. W. 176; State v. Tarwater, 293 Mo. 273, 239 S. W. 480; State v. McGee, 336 Mo. 1082, 83 S. W. (2d) 98; 23 C. J. S., Sec. 1362.

There is a vast difference in this case and State v. Dodson. There the cause had been submitted to the jury. The jury went to see the "New Zephyr" train, then on exhibition, and mingled with the crowd. In addition the jury went to two shows and one dance while the trial was in progress. State v. Hayes, 323 Mo. 578, 19 S. W. (2d) 883 and State v. Connor (Mo.), 274 S. W. 28 were jury separation cases.

In her motion for a new trial the appellant assigns as error misconduct on the part of the jury in their deliberations in that they took into consideration and were influenced by facts relative to her which were not testified to by witnesses but which were furnished by two jurors. In support of her assignment the appellant filed and relies upon the affidavits of an attorney employed to represent her and an individual whom the attorney employed to assist him. The substantial part of the affidavits is that after the case was over and in the town of Jasper one of the jurors told them that another juror

said, after the jury retired to consider its verdict: "I know the defendant and know that she is a no-good woman; I know these facts regardless of the evidence in the case; I have seen her in company with Mr. Trusty in Kansas City, Springfield and Miami, Oklahoma." Another juror is said to have agreed that he knew the same facts to be true. One of the affiants said that the juror from whom he obtained the information was influenced by the statements and that he did not think the appellant guilty. Though the appellant makes no point of it she offered but the court refused to hear the evidence of the two informing jurors. The state filed the affidavit of the juror who was supposed to have made the statements and he categorically denied making them or that he knew the appellant.

In State v. Malone, 333 Mo. 594, 62 S. W. (2d) 909, the defendant's attorneys, his brother, his brother-in-law and several others sat in a room adjacent to the jury room and overheard the jury deliberating. They heard one of the jurors tell his fellows that on a former trial the defendant had been convicted and given twenty years, that the defendant had been in trouble several times before and "if we don't punish him this time he will be in trouble again." In Reich v. Thompson, 346 Mo. 577, 142 S. W. (2d) 486, 129 A. L. R. 795 a deputy circuit court clerk overheard a juror imparting information, as of his own knowledge, to the jury. In the Reich case the trial court granted a new trial. But in both cases the juries' verdicts were impeached by the affidavits and evidence of those who overheard the jurors during their deliberations. Further than that we have never gone in this state. Even when the trial court has overruled a motion for a new trial based on an eavesdropper's affidavit of misconduct on the part of the jury we have usually deferred to the trial court's discretion. State v. Coleman, 264 Mo. 435, 175 S. W. 209. As was pointed out in the Reich case a "juror will not be heard to impeach" his and the jury's verdict, either as to conduct inside or outside the jury room, either before or after their discharge. State v. Bailey, 344 Mo. 322, 126 S. W. (2d) 224; State v. Keller (Mo.), 104 S. W. (2d) 247. It necessarily follows that "affidavits or testimony of third persons as to statements of jurors tending to impeach their verdict are inadmissible, not only as hearsay but also for the same reason which excludes the affidavits or testimony of the jurors themselves." 23 C. J. S., Sec. 1495; State v. Rush, 95 Mo. 199, 8 S. W. 221. This is so even though the jurors' affidavits may be used in support of the verdict. State v. Westmoreland (Mo.), 126 S. W. (2d) 202.

 The appellant offered and the court declined to give an instruction which told the jury that they could not "indulge in speculation or guesses as to the evidence in this case." It told them that they were to find the facts solely from the testimony and the law from the court's instructions. The last sentence said that after receiving the instructions and finding the facts the jury were "to judge of them and

say what the verdict ought to be, considering what the law is and what the facts are'' and ''you are not authorized to go outside of the testimony submitted on the trial of this case to find the facts of the case.''

The appellant concedes that this is a cautionary instruction and that whether it was given or refused was within the trial court's discretion, reasonably exercised. State v. Peters (Mo.), 123 S. W. (2d) 34. But the appellant reviews the evidence and says that the court abused its discretion. It is unnecessary to review the evidence and the possible inferences, and even insinuations, which might be drawn from it in the light of this instruction. One given instruction said: ''It is the duty of the court to instruct the jury on all questions of law arising in the case, and it is your duty to receive such instructions as the law of the case, and to find the defendant guilty or not guilty according to the law as declared by the Court in these instructions and the evidence as you have received it under the direction of the Court.'' It appears to us that this instruction substantially embodies everything contained in the appellant's instruction. In addition, the court instructed fully on reasonable doubt and the credibility of the witnesses. Under the circumstances the court did not abuse its discretion or err in refusing the abstract cautionary instruction.

None of the briefed and argued assignments being well taken the judgment is affirmed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.

### ON MOTION FOR REHEARING.

PER CURIAM:—In her motion for a rehearing the appellant agrees with the view that ''imperfect self-defense'' means no more in the law of homicide than that if there is any evidence in the case, either from the state's evidence or from the defendant's evidence (State v. Wright, 352 Mo. 66, 175 S. W. (2d) 866), from which the jury could find a lack of malice on the part of the accused she is entitled to an instruction on manslaughter. The absence of malice, if found by the jury, reduces the degree and grade of the offense from murder to manslaughter.

But the appellant contends that we have overlooked certain testimony which brings the case within State v. Roberts, 280 Mo. 669, 217 S. W. 988. In addition to the testimony set forth in the principal opinion the appellant directs our attention to that part of her cross-examination in which the Prosecuting Attorney was questioning her with reference to statements she was supposed to have made at the police station and particularly with respect to what she had said had happened when the second shot was fired. The prosecutor was asking her whether he had not asked her certain questions and whether she had not made certain answers, among others:

"Question. Was that in your bedroom? Answer. 'No, in the kitchen.' Question. 'Where were you?' Answer. I think I was in the kitchen door, *as I said, I had stepped out to see what had happened and whether he was coming back at me or what.*' Are those your words, Mrs. Ferguson? A. Yes."

In the first place, in State v. Roberts, the court was considering a self-defense instruction which covered the subject of voluntarily entering or renewing a difficulty as a pretext for the defendant's taking the life of his assailant. However, the court did say that if the "appellant wrongfully invoked or sought a renewal of the quarrel with the intention of merely overawing the deceased, or of holding him in check while a discussion could be had and a settlement or a mutual understanding reached as to their future status towards each other, or to accomplish any result other than the death or great bodily harm of the deceased, the appellant, while he would not be entitled to invoke the perfect right of self-defense, would under the well established rule, we think, be entitled to invoke the right known as the imperfect right of self-defense, which would reduce the crime to manslaughter in the fourth degree."

But in the second place, going into the kitchen "to see what *had* happened and whether he was coming back at me or what" is an entirely different matter from returning to the controversy for the purpose of holding one's adversary in check for the purpose of reaching a mutual understanding or settlement of one's difficulties with one's adversary. Merely going into the kitchen, after having fired one shot, for the purpose of seeing "*what had happened and whether he was coming back at me or what*" is certainly not comparable to "Well, I went down there to see if I could settle the difficulty without any further trouble if I could, because I wanted to settle it while it was new. He and I had been good friends, and I thought probably I could do it in that way, and I took the gun along with me to defend myself if I couldn't." The latter statement or version of the matter dispels malice, while the former statement and circumstance is but consonant with self-defense and certainly consistent with murder.

The motion for a rehearing is overruled.