STATE of Missouri,
Plaintiff-Respondent,

v.

Arlis  GREATHOUSE,
Defendant-Appellant.

No. 13201.

Missouri Court of Appeals,
Southern District,
Division Three.

July 23, 1985.

Motion for Rehearing or Transfer Denied
Aug. 12, 1985.

Application to Transfer Denied
Sept. 10, 1985.

David E. Woods, Public Defender, Poplar Bluff, for defendant-appellant.

John Ashcroft, Atty. Gen., Richard Baugh, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HOGAN, Judge.

In separate informations, defendant Arlis Greathouse was charged with burglary as defined and denounced by § 569.170, RSMo 1978,[1] and stealing without consent, as defined and denounced by §§ 570.030.1 and 570.030.2(1). Venue of the cause was changed from Carter to Oregon County. A jury found defendant guilty of burglary and by separate verdict found him guilty of stealing. Defendant's sentence was enhanced on both convictions upon the court's finding that he was a persistent offender. His punishment was assessed at imprisonment for a term of 15 years for each offense, the terms to run consecutively.

Kendall Combs owned and operated a general store known as the Van Dyke Store in Ellsinore, a community of about 362 people located in Carter County. Combs sold groceries, hardware and sporting goods, including guns. The dimensions and location of the building are difficult to articulate because we have no exhibits before us, but Combs testified that the premises were illuminated at night by some "Ozark border lights" and a 300-watt bulb "right on the edge of the store building." Combs worked at the store on Saturday, May 1, 1982. He closed the business about 6 p.m. The several entrances to the store were carefully locked.

Combs had decided to go turkey hunting on Sunday, May 2, as that was the last day of the season. He arose about 5 or 5:30 a.m. A friend, Donald Hampton, came to Combs' residence and picked him up. Hampton was driving a truck. Combs sat "on the passenger [side] right by the door." Hampton got gas, and the two men decided on a place to hunt. They "decided to go back out A Highway, so [they] had to go back through town." Their route took them past the Van Dyke Store.

Some distance from the store, Combs noticed a car parked by a loading dock at the back door of his store. He asked Hampton to drive around to the back of the premises. Hampton did so, and Combs found a "car ... parked right at the very side of the store, right toward the back with the trunk open." Attempting to be more specific, Combs testified there was a 4' × 7' loading dock "[r]ight at the side of the store at the very back"; the automobile was parked "right beside [the dock] with the trunk open" parallel to the steps which led from the ground to the top of the dock.

Combs saw a man come around the side of the car; the man got in the car "behind the steering wheel." At this point, Combs was "about 20 feet" from the man who got in the car. Over the defendant's strenuous (and misplaced) objection, Combs identified the defendant as the man who came around the car and got in the driver's seat.

As Hampton drove past the car, another man came out of the store. Combs then "jumped out of the truck" and a third man came out of the store. This third man "had some guns in his hands." Combs, shotgun in hand, "hollered for him to halt." This third man looked at Combs and jumped in the car. The automobile "started to leave" so Combs "shot at it three times." He "got some of the taillight [sic] and the trunk lid and knocked the back glass out of it." Combs and his companion pursued the burglars, but lost them after the burglars turned on to Highway 60. The vehicle was described as a "silver color Ford, about a '79 or '80. Like a Galaxie or LTD, something like that."

The defendant and his accomplices were apprehended and taken in custody in Reynolds County. The property which they had managed to remove was seen by Combs at the sheriff's office in Centerville. Combs also took an inventory of the items which were taken—16 guns and some watches and knives and ammunition. There was other merchandise which the burglars had

1. References to statutes and rules are to RSMo 1978 and Missouri Rules of Court (14th ed. 1983), except where otherwise noted.

been unable to remove from the premises. Combs estimated the value of the property taken at $3,000 to $3,500.

The State also had the evidence of Jimmy Dwayne Beck, who was married to defendant's stepdaughter Debra. On May 1 and 2, 1982, Beck and his family lived with the defendant and his family at the defendant's residence in Doniphan. Beck retired about 11 p.m. on Saturday, May 1. About 2 a.m., he was awakened by the defendant. The defendant "wanted to go for a ride." Beck agreed. The defendant, Beck and one Kenneth Todd thereupon drove from Doniphan to Ellsinore. When they arrived at Ellsinore, the defendant started "circling around" the Van Dyke Store. The defendant then told his two companions that he wanted them to break in the store and steal " 'knives, watches, guns, and shells' " because "that's what ... sold the best." There is no mistaking the store about which Beck was testifying; he was shown State's Exhibit 4, a photograph of the loading dock at the Van Dyke Store and immediately stated "Van Dyke Store."

Beck and Todd got out of the car, walked around the store and decided to break in through a "little small window" next to the loading dock. Beck was not a very skillful burglar; there was a metal bar across the window which Beck was unable to cut with a hacksaw. Beck and Todd informed the defendant they were unable to break in. The three men went back to Doniphan.

Presently, the defendant told Beck "we was going to go try it again." The three men returned to Ellsinore—"Back to the Van Dyke Store." This time, Beck managed to get the window bar cut. He crawled in the store, got a crowbar and pried the lock off the sliding door which opened onto the loading dock. Todd "went to get [the defendant]" so the men could carry off what they could steal. There was a "[p]retty bright" light at the place where defendant parked his vehicle, and Beck was able to see without further illumination. The defendant got out of his car, came in the building and made two or three trips

carrying property out of the store. Beck was shown stolen merchandise assembled on a table in the courtroom and marked as State's Exhibit 14. This property had been identified by Combs as property taken from his store. Beck recognized it as "being the stuff [he] took out."

This witness was specifically asked: "Q. All right. You actually saw Arlis Greathouse inside the store building? A. Yes. Q. Saw him carrying guns out? A. Yes." Beck recalled Combs' attempt to stop the burglars, adding that as soon as Combs began shooting, defendant "[t]ook off." Defendant planned to drive his vehicle to Lebanon to have it repaired. Defendant, Beck and Todd "got to Reynolds County and then that's where [they] got caught." Such is the substance of the State's case. Other evidence will be specifically noted as material.

The defendant has briefed twelve assignments of error. Points VII and XI deal with the sufficiency of the evidence to support the verdicts. Point XI consists wholly and solely of an assertion that the evidence does not support the verdict; Point VII is, in substance, a specific assignment that the ownership of the goods stolen was not proved.

■ All that need be said about Point XI is that in assessing the sufficiency of the evidence, this court must accept as true all evidence and inferences which tend to support the verdict and disregard all evidence and inferences to the contrary. The question is always whether the evidence, viewed in a light most favorable to the State, is sufficient to support the verdict. *State v. Brown*, 660 S.W.2d 694, 698–699[9–10] (Mo. banc 1983); *State v. Story*, 646 S.W.2d 68, 72 (Mo. banc 1983). We have considered the evidence in that light and find there is ample evidence to support both judgments of conviction.

■ Point VII is a particular complaint that the ownership of the stolen property was not established. We are cited only to the statute, § 570.030.1.

The phrase "property of another" as used in § 570.030.1 must be construed by reference to § 570.010(9) which defines the scope of the words "of another" by stating that "property or services is that 'of another' if any natural person, corporation, partnership, association, governmental subdivision or instrumentality, other than the actor, has a possessory or proprietary interest therein." The evidence was that the property stolen by the defendant was held for sale by corporations which Combs either owned or controlled.[2] Lawful custody and control of property is a sufficient attribute of ownership to support an averment and proof of ownership against one charged with stealing goods which are "property belonging to another." *State v. Hill,* 528 S.W.2d 798, 801 (Mo.App.1975). There was substantial evidence that the property stolen was the "property of another" within the scope of § 570.030.1.

Defendant contends that Kendall Combs should not have been permitted to identify the defendant as the driver of the car Combs found parked beside the Van Dyke Store at the time the burglary was taking place "because there was no independent basis for Combs [sic] identification in determining the reliability of his identification under the totality of the circumstances." As authority for this contention defendant cites *State v. Story,* 646 S.W.2d 68 (Mo. banc 1983).

In *Story,* the court discussed the criteria of reliability to be applied when an in-court identification is attacked on the ground that pretrial identification procedures violate the due process right established by *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The defendant's argument is difficult to follow. There was no corporeal lineup nor any photographic display. There was no *compelled* confrontation of any kind. The only encounter between Combs and the defendant after the burglary and prior to the trial

occurred at the defendant's preliminary hearing. At that time Combs saw defendant at the Carter County courthouse. The defendant was standing in the sheriff's office, but there is no record indication that the defendant was in custody at that time. Combs did not identify the defendant at the preliminary hearing.

Even when one-on-one viewings are compelled by the State, they are not necessarily suggestive or improper. *State v. Bynum,* 680 S.W.2d 156, 158 (Mo. banc 1984). The confrontation complained of in this case, by contrast, appears not to have been designed or compelled by the State; the encounter was a coincidence. Most courts which have considered such coincidental encounters, or accidental showups, as they are sometimes called, have taken the view that no due process issue is raised by an accidental showup because the confrontation was not compelled by the State. *Kimble v. State,* 539 P.2d 73, 77 (Alaska 1975); *Hill v. United States,* 367 A.2d 110, 115[7–9] (D.C.App.1976); *People v. Graham,* 67 A.D.2d 172, 415 N.Y.S.2d 714, 717[1] (1979); 1 LaFave and Israel, Criminal Procedure § 7.4, p. 583 (1984). We believe that is true here, and find the defendant's point to be without merit.

Defendant by his Point I asserts that the trial court abused its discretion in denying his oral motion for a continuance to obtain the presence of Mrs. Alma Thomas, a witness subpoenaed in his behalf. The defendant's defense was alibi, and Mrs. Thomas' testimony would have corroborated evidence given by the defendant's wife. That evidence was that the defendant and his wife had prepared to remove their residence to a mobile home in Lebanon on or about April 29, 1982, and that defendant's wife had called the witness prior to the move and asked the witness to "open" a trailer which had been rented to

---

**2.** "Q. ... So you personally only own the building, and all—the business, the store, the merchandise, everything is actually—belongs to a corporation, and not [to] you personally; is that correct? A. Well, that's right. But I own all the stock in the corporation, too. So really its mine, too, so—Q. Sure. But you're incorporated? A. Yes, ma'am."

the defendant. The State offered to stipulate " ... that on April 22, 1982, [defendant's] wife arranged to rent [a] trailer in Lebanon, Missouri, and that on the 29th of April, Mrs. Greathouse called Alma Thomas asking her to prepare the trailer for their arrival, and that they moved out of the trailer park on May 22, 1982." Defense counsel refused the stipulation on the ground it was not "as effective" as testimony by deposition or in person. The defendant had proof, of sorts, that Mrs. Thomas was ill and unable to travel.

■■■ An application for a continuance is addressed to the sound discretion of the trial court and an appellate court will not interfere unless it clearly appears that discretion has been abused. This general rule applies when the continuance is sought to obtain the presence of material witnesses under subpoena. *State v. Reece*, 505 S.W.2d 50, 52[2–6] (Mo.1974); *State v. Scott*, 338 S.W.2d 873, 876[4] (Mo.1960); *State v. LeBeau*, 306 S.W.2d 482, 486 (Mo. 1957). In this connection, our courts have held that a conviction will not be set aside for failure to grant a continuance to obtain the presence of a material witness unless it appears to be reasonably probable a different result would have obtained if the absent witness had testified. *State v. Reece*, 505 S.W.2d at 52; *State v. Cochran*, 147 Mo. 504, 516, 49 S.W. 558, 562 (1899). Even granting trial counsel a measure of diligence the record does not justify, we cannot say any such reasonable probability appears here. Mrs. Thomas' testimony would only have corroborated the evidence of other witnesses to the effect that the defendant was in Laclede County when the burglary was committed. There was no abuse of discretion.

By his point III the defendant asserts that the trial court erred and abused its discretion in failing to grant a mistrial and in refusing to quash the jury panel because four veniremen stated they would be inclined to believe Kendall Combs if he testified and five other veniremen stated they thought a criminal defendant would testify in his own behalf if he were not guilty. It

is admitted that this point is before us only as a matter of plain error; therefore by the express terms of Rule 29.12, the alleged errors are grounds for reversal only if it appears that manifest injustice or a miscarriage of justice has resulted from the trial court's refusal to act.

A panel of 28 jurors was summoned. This was a sufficient number to satisfy the requirements of § 546.180.1(2), RSMo (Supp.1983). Upon voir dire examination by the State Venireman # 14, Judy Mills, indicated she was Combs' "cousin" and that she would probably believe his testimony if it was contrary to that of another witness. Venireman # 18, Gene Boze, did not know Kendall Combs, but he knew the family. He "[would have been] persuaded towards the ones [he knew] more than the ones [he didn't] know." Venireman # 24, Lawrence Combs, was a very distant cousin of Kendall Combs' and would probably have given Kendall Combs' testimony greater weight than he would have given to another witness. Venireman # 25, Alan Sanders, was a cousin germane of Kendall Combs. He would have accepted the testimony of Kendall Combs more readily than that of another witness. Venireman # 26, Mary Combs, was Kendall Combs' aunt. She would have tended to believe Kendall Combs' testimony if it conflicted with that of another witness. All five of these veniremen were stricken from the panel by the court. This left a panel of 23 jurors.

Upon voir dire by the defendant, Venireman # 9, Louis Krusor, was asked if he believed that if a defendant were not guilty, that the defendant would testify in his own behalf. Mr. Krusor answered that he did, and that he would probably be prejudiced if the defendant did not testify. Venireman # 6, Lucille Hensley, responded in similar fashion. Venireman # 8, C.H. Woods, also stated he felt the same way. Venireman # 15, Delbert Chester Morris, thought a defendant should testify in his own behalf. These four jurors were stricken from the panel by the court of its own motion. This left a panel of 19 jurors. The State thereupon relinquished five of its

six peremptory challenges; defendant was allowed the six peremptory challenges mandated by § 546.180.1(2), RSMo (Supp. 1983).

In a wandering argument developed very loosely, the defendant argues that because two prospective jurors had discussed the case before the voir dire commenced, the jury was contaminated by prejudice. Inspection of the record discloses that Venireman Mary Combs had told Venireman # 27, Gordon Huggins, something about the case. Venireman Mary Combs was excused. Venireman Huggins had formed no opinion because of his conversation with Mrs. Combs, was still able to presume that the defendant was innocent, and was still able to decide the case on the basis of the evidence presented. Otherwise, counsel asserts that "the entire jury panel was tainted by the comments made on Voir Dire by other potential jurors...."

▮▮▮ While we do not suppose that the Public Defender's Office is trying to mislead this court, defendant's cause is ill served by exaggeration. The veniremen who were interrogated did not "comment" in the sense that they expressed a preconceived judgment upon the merits of the case. Even if a venireman makes a broadly judgmental statement about the cause or a derogatory remark about the defendant, a mistrial or discharge of the panel is not automatically required. In *United States v. Pantone*, 609 F.2d 675, 679[1] (3d Cir. 1979), during a voir dire concerning pretrial publicity, one juror testified she had heard another juror remark " 'Well, it sounds like everybody is guilty, or something like that.' " Another juror testified to a "humorous" comment regarding the defendant's guilt. The trial court immediately held a corrective voir dire during which all jurors stated that nothing had occurred which would influence the verdict or their impartiality. The trial court refused a mistrial. On appeal, a panel of the Third Circuit held, 609 F.2d at 679:

> "Certainly the occurrence of the conversations referred to is not ground for an automatic mistrial, and no showing of

any likelihood of actual prejudice has been made on this record...."

In *United States v. Morrone*, 502 F.Supp. 983, 1003 (D.C.Pa.1980), *cert. denied*, 455 U.S. 941, 102 S.Ct. 1433, 71 L.Ed.2d 652 (1982), a corrective voir dire was conducted after a venireman volunteered: " 'It looks like the Mafia is here.' " The district judge conducted a corrective voir dire which disclosed that only two jurors had heard the remark. One was struck by the Government; the other served only as a non-participating alternate. The court concluded that no prejudice resulted. *United States v. Morrone*, 502 F.Supp. at 1003[16]. In *State v. Taylor*, 324 S.W.2d 643 (Mo.), 76 A.L.R.2d 671 (1959), one member of the panel expressed a feeling that she felt like giving the defendant the maximum sentence "right now" and saw no reason to listen to the evidence. Defendant requested discharge of the entire panel, which was refused. The trial court did excuse the prejudiced venireman and instructed the jury panel to disregard what she had said. Our Supreme Court affirmed, holding there was no abuse of discretion. *State v. Taylor*, 324 S.W.2d at 648[9–11], 76 A.L.R.2d at 677–678. In the case before us, the controlling rule is that the disqualification of one, or several, members of the jury panel does not require discharge of the entire panel nor declaration of a mistrial. *State v. Bushman*, 642 S.W.2d 117, 120[3] (Mo. App.1982); *State v. McKinney*, 630 S.W.2d 96 (Mo.App.1981). Moreover, when trial counsel claims the impartiality of the panel has been tainted by comments made during voir dire, he has the burden to show prejudice to his client. *State v. Bushman*, 642 S.W.2d at 121[5]; *State v. Browner*, 587 S.W.2d 948, 952 (Mo.App.), 16 A.L.R.4th 795 (1979). There is no such showing here, and the trial court did not abuse its discretion in failing to declare a mistrial or in refusing to discharge the entire panel.

▮▮▮ Defendant's points V and VI may be considered together. He contends that the trial court erred in allowing witness Jerald Daugherty to testify because

Daugherty was not endorsed as a witness on the information as required by Rule 23.01(f). Mr. Daugherty was called only to produce and identify public records. Rule 23.01(f) in terms excludes such witnesses from endorsement on the information. Defendant also contends the State produced no competent evidence of prior convictions from the transcripts and records of the Missouri Department of Corrections because the records were not "properly certified" and were not sufficient to identify the defendant as the person who had previously been convicted of two felonies committed at different times as required by § 558.-016.3, RSMo (Supp.1983). All the record before us shows is that the trial court received certified copies of two prior convictions from the Circuit Clerk of Wright County and certified records of the Department of Corrections. None of the documents are before us. We are remitted to holding that in order for an appellate court to review an alleged error in the trial court, the appealing party must see to it that the record on appeal incorporates the basis for the challenged error. *State v. Jones*, 594 S.W.2d 932, 935 (Mo.1980); *State v. McCoy*, 559 S.W.2d 298, 300 (Mo.App.1977). Inasmuch as the challenged documents are not before us, the defendant has failed to meet his burden to demonstrate error.

■ Assignment of error IX is again a diffuse, rambling point, the substance of which is that the information is not sufficient to charge the defendant as a persistent offender under the provisions of § 558.-016.3, RSMo (Supp.1983). Rule 23.01(e) provides that all indictments or informations which are substantially consistent with the forms of indictments or informations which have been approved by the Supreme Court shall be deemed to comply with the substantive provisions of Rule 23.-01, which prescribes the general form and content of indictments and informations to be used in felony prosecutions. The amended informations filed in this case carefully track the language of MACH–CR 2.30, approved for use by our Supreme Court by order dated January 10, 1979. This form was not superseded until June 1,

1983. The informations were filed October 12, 1982. The only case cited by defendant is *State v. Wickizer*, 583 S.W.2d 519 (Mo. banc 1979). That case dealt with the sufficiency of an information filed under the old Second Offender Act, § 556.280, which was repealed by the Criminal Code, Laws of Mo.1977, S.B. 60, which became effective January 1, 1979. The informations were in all respects sufficient.

■ Concerning the vague seventh amendment complaints suggested but not coherently briefed, for example, that the trial court should have submitted the defendant's punishment to the jury as well as his guilt, we will only say that § 557.036, and § 558.021, RSMo (Supp.1983), as they appear in the 1983 revision, became effective September 28, 1981, and were therefore in effect when the crimes alleged were committed, and had not been effectively amended when this case was tried on February 4, 1983. We are not presented with any infirmity created by the savings statutes, such as those considered in *State v. Thornton*, 651 S.W.2d 164 (Mo.App.1983).

■ Defendant argues in his point X that the trial court should have declared a mistrial because of a statement volunteered by a defense witness. Counsel asked for no other relief and concedes that granting a mistrial lies in the discretion of the trial court. *State v. Reynolds*, 608 S.W.2d 422, 427 (Mo.1980). By his point XII, defendant asserts that the trial court abused its discretion by not granting a severance of the two charges against him. By his point IV, defendant alleges the trial court erred in failing to read MAI–CR.2d 1.08 to the jury when the court recessed to allow counsel to make their peremptory strikes.

■ We find no abuse of discretion in refusing to declare a mistrial as alleged in point X; we find no error in refusing to try the offenses charged separately, as urged in point XII, and we find from the record that MAI–CR.2d 1.08 was read to the jury before the recess was taken. The instruction was not read by Judge Caskey, as he is

unsighted. He is nevertheless a careful trial judge who has the respect of this court and it is of no consequence that he himself did not read the instruction.

The final point for consideration is defendant's point VII, which is really two assignments combined. The defendant contends that the trial court's "findings" were not sufficient to satisfy the requirements of § 558.021.1(3) which requires the trial court to make findings of fact that warrant a finding beyond a reasonable doubt by the court that the defendant is subject to being punished by an extended term.

In this case, the court actually held two hearings to determine whether the defendant was subject to being sentenced to an extended term. One hearing was held after counsel had made their peremptory challenges but before the jury was sworn; another was held immediately before the case was submitted to the jury. At both hearings, the conditions prescribed by § 558.021, RSMo (Supp.1983), were complied with. Thereupon, the trial court announced:

"... The Court finds that the Defendant has two prior convictions, one of burglary and stealing, one of burglary. Therefore, should the jury find him guilty of this charge, it would be as a habitual criminal.

[THE PROSECUTING ATTORNEY]: Persistent offender.

THE COURT: I mean persistent offender. Excuse me. Get the proper language."

■■■ This court has recently and fairly carefully examined the sentence enhancement statutes. In *State v. Light,* 686 S.W.2d 538 (Mo.App.1985), this court remanded a case to permit entry of the "findings" required by § 558.021.1(3) in light of the holdings in *State v. Thompson,* 629 S.W.2d 361 (Mo.App.1981), approved *State v. Thompson,* 629 S.W.2d 369 (Mo. banc 1982), *vacated on other grounds,* 459 U.S. 1193, 103 S.Ct. 1172, 75 L.Ed.2d 424 (1983); *State v. Davis,* 663 S.W.2d 301 (Mo.App. 1983), and *State v. Arbeiter,* 664 S.W.2d

566 (Mo.App.1983). We adhere to our ruling in *State v. Light,* 686 S.W.2d 538. However, in *State v. Light* there was no finding of any kind. In the case before us, the findings could have been more specific, but the concern for due process is focused upon the existence of independent evidence sufficient to support the enhancement of the defendant's sentence and not upon the particularity of the trial court's finding. The trial court's finding is sufficient to show it relied on the evidence presented. We further have the view that record errors in delineating the basis for a sentence, when such an explanation is called for by statute or otherwise, are reversible only when it is made to appear that the court relied on erroneous or incorrect information. See, e.g., *United States v. Hawkins,* 658 F.2d 279, 289–290[7, 8] (5th Cir.1981). No such showing has been made and the point is without merit.

■■■ The other part of this point is that the trial court erred in imposing two consecutive terms of imprisonment. With certain exceptions not material here, § 558.-026.1 has made the imposition of concurrent or consecutive sentences discretionary since the Criminal Code became effective. The crimes are separate; they may now be separately punished. See: The New Missouri Criminal Code: A Manual for Court Related Personnel, p. 14–21 (1978). The punishments assessed are within the limits authorized by § 558.016, RSMo (Supp. 1983). The trial court did not err in assessing the defendant's punishment.

■■■ We have not overlooked the defendant's pro se communications and his motion to remand the cause for the purpose of allowing him to file a motion for new trial on the ground of newly-discovered evidence. Defendant's evidence consists of an affidavit executed by Kenneth Todd to the effect that defendant "had nothing to do with" the burglary and larceny of the Van Dyke Store on May 2, 1982. This court has no authority to grant such a motion; if the defendant's contention has merit, his reme-

dy lies elsewhere. See *Whitaker v. State,* 451 S.W.2d 11 (Mo.1970).

We find no error upon the record presented. Accordingly, the judgments are affirmed.

CROW, P.J., PREWITT, C.J., and TITUS and MAUS, JJ., concur.