**STATE of Missouri, Plaintiff–Respondent,**

v.

**William KING, Defendant–Appellant.**

No. 21633.

Missouri Court of Appeals,
Southern District,
Division Two.

March 6, 1998.

Motion for Rehearing and Transfer
Denied March 26, 1998.

Application to Transfer Denied
April 21, 1998.

Larry Maples, Carthage, for appellant.

No appearance for respondent.

PARRISH, Presiding Judge.

William King (defendant) appeals convictions of driving while his license was suspended (Count I), § 303.370.3, RSMo 1994; failing to stop for a stop sign (Count II), § 304.351.4(1)(a);[1] failure to yield to an emergency vehicle sounding audible siren signal or displaying lighted visible red light (Count III), § 304.022.1; and resisting arrest (Count IV), § 575.150. This court affirms.

The state filed no brief in this case. This court has been provided no explanation for the flagrant disregard by the prosecuting attorney of Barton County of the requirements of § 56.060.1, RSMo 1994, that provide:

> If any misdemeanor case is taken to the court of appeals by appeal [the prosecuting attorney] shall represent the state in the case in the court and make out and cause to be printed, at the expense of the county, all necessary abstracts of record and briefs, and if necessary appear in the court in person, or shall employ some attorney at his own expense to represent the state in the court, . . . .

As explained in *State v. Bowlin,* 850 S.W.2d 116, 116–17 (Mo.App.1993), and reiterated more recently in *State v. Musil,* 935 S.W.2d 379, 380–81 (Mo.App.1996):

> Our review of this case is not aided by the State's failure to file a brief. No penalty is prescribed for failure to file a brief on an appeal of a misdemeanor conviction. *State v. Harrington,* 679 S.W.2d 906, 907 (Mo.App.1984); *State v. Michaels,* 543 S.W.2d 245, 247 (Mo.App.1976). However, this leaves us with nothing presented other than the . . . arguments of defendant. It is not the function of the appellate court to serve as advocate for any party to an appeal. When one party fails to file a brief, the court is left with the dilemma of

---

1. References to statutes are to RSMo Supp.1996,    unless stated otherwise.

deciding the case (and possibly establishing precedent for future cases) without the benefit of that party's authorities and points of view. Appellate courts should not be asked or expected to assume such a role. *Thummel v. King,* 570 S.W.2d 679, 686 (Mo. banc 1978).

"[W]e cannot understand why a prosecutor would neglect his statutory duty to see that the state was adequately represented through the entire criminal proceeding." *State v. Harrington,* 679 S.W.2d at 907.

The following facts are gleaned from this court's review of the transcript filed as part of defendant's record on appeal.

During the early morning hours of September 29, 1996, Lamar Police Officer Tammy Deherrera[2] observed a gray flatbed pickup truck with Oklahoma license plates weaving on the roadway within the city limits of Lamar. She suspected its driver was intoxicated. She activated the emergency lights on the top of her patrol car and pursued the pickup. The pickup did not stop, but continued traveling through the city at the same rate of speed at which it was traveling before pursuit.

The Lamar Police Department has a policy that requires officers to obtain permission from their supervisor in order to pursue cars beyond the city limits. Officer Deherrera inquired whether she had permission to continue her pursuit. She was advised that a highway patrol officer was en route to assist and was instructed to discontinue the pursuit.

Officer Deherrera stopped her patrol car just beyond the Lamar city limits. She pulled onto the gravel shoulder of the roadway. She could see emergency lights approaching in her rear view mirror. A white highway patrol car passed her. At the time it passed, she could see both it and the pickup she had been pursuing. The pickup had continued eastbound on Highway 160.

The highway patrol vehicle was driven by Cpl. Mike Stone. He had been coming into Lamar from the west when he heard radio

traffic concerning Officer Deherrera's pursuit. He continued eastbound through town until he saw the flashing red lights on Officer Deherrera's patrol car. Cpl. Stone explained, "And then I could see the—her patrol car was on the shoulder of the roadway, and I saw the truck that she was—she was chasing."

When Cpl. Stone passed Officer Deherrera's patrol car, the pickup truck "was probably 20 car lengths ahead of her." He continued to pursue the pickup. Cpl. Stone closed the distance between his patrol car and the pickup. The pickup's left turn signal was flashing. Cpl. Stone testified that he got to the pickup; that it was in a left turn lane "right on the centerline." He believed the pickup was going to turn left. Cpl. Stone told the court and jury:

And then it set down in front of me quickly, and I braked quickly and steered to the right. At this time the truck veered hard right and I had to turn short of the intersection. And my right wheel—right rear wheel struck the tin whistle and slightly bent it, but it didn't disable me.

Cpl. Stone observed that the vehicle "was a gray truck, flatbed, one male driver in it wearing a ball cap." It had an Oklahoma license plate.

The pickup turned south. Cpl. Stone followed. He turned on a red and blue light bar on his patrol car to signal for the pickup to stop. The pickup accelerated to 60 mph. Cpl. Stone turned on his siren and called for assistance with the pursuit.

The pickup continued to travel in a southerly direction until it came to Southeast 20th Lane where it turned east. Cpl. Stone followed with both his emergency lights and siren activated. The pickup came to T Highway where there was a stop sign. The pickup crossed the highway without even slowing its speed. After "[a]bout a quarter of a mile" the pickup turned into a field. Cpl. Stone followed the pickup into the field. He realized his car could not travel across the terrain of the field and turned around. His car

---

**2.** The index to the transcript spells this officer's name "Delherrea"; however, her name is spelled "Deherrera" in the text of the transcript. The spelling from the text of the transcript will be used in this opinion.

became stuck before he got back to the roadway.

Barton County Deputy Sheriff Shannon Higgins was on duty during the early morning of September 29, 1996. He heard radio transmissions concerning a vehicle that had not stopped for a Lamar city officer. He drove east out of Lamar on Highway 160. He learned that the city officer had discontinued pursuit and that a highway patrol car continued to pursue the fleeing vehicle; that the vehicle had continued eastbound on Highway 160. As he approached 20th Road, he saw a vehicle pass over T Highway followed by an emergency vehicle. He believed the emergency vehicle was the highway patrol car.

Officer Higgins was "approximately three-quarters of a mile away to the north" from the two vehicles. He explained what he saw as he drove toward them. He lost sight of the vehicles briefly until he topped a hill. He testified, "And I noticed the vehicles looked to be snaking, turning continuously back and forth." As he got closer he realized they were in a field.

Officer Higgins stayed on the roadway so he would be available to intercept the vehicle that was being pursued if it attempted to leave the field and re-enter the roadway. He was "probably about 60 feet" from the vehicle. He realized it "was a ton pickup with a flatbed on it." He saw the highway patrol car stuck in the field. He decided to go to the "south end of the section and make sure that the vehicle did not enter the roadway there."

Officer Higgins estimated that he went south one mile to a road that ran east and west, 30th Road. He turned west onto 30th Road. He went about half a mile when he saw something in the roadway. He described what he saw:

It seemed to be light, but it was light going away from me. And I had taken—I had assumed that it was the vehicle that we were chasing, and that in the process of going through the field, it had drug it taillight wires out.

As Officer Higgins got closer he realized the vehicle was facing him but was going backward; that what he was seeing was the vehicle's back-up lights moving away from him—it did not have its headlights on. Officer Higgins followed the vehicle as it backed away. He testified, "The vehicle proceeded to back westbound down 30th Road until there was a small jog in the road. And it didn't quite navigate the road correctly and backed into a ditch. And then at that time I got to about 30 feet away." He was asked the following questions and gave the following answers:

Q. No headlights. Did you have any lights on?

A. I had my high beam headlights on, what they call take-downs or overhead high beam lights off the light bar that's on my vehicle, and all of the red lights on it were all on.

Q. Okay. And you say—Oh, high beam?

A. High beam.

Q. Okay. And where were they directed? Was it-

A. They were directed at the—at the vehicle.

Q. Okay. At that point did you get a view of the driver?

A. Yes, I did.

Q. Okay. Did you know who the driver was?

A. I identified the driver as William Bradley King.

Officer Higgins then made an in-court identification of defendant as William Bradley King. He explained that he had known defendant before September 29, 1996; that he was "absolutely sure" the person in the truck was defendant.

Officer Higgins was asked what happened after the truck backed into the ditch; whether it moved after that. He answered, "Yes, it did. It managed to get out of the ditch and continue north across another ditch, back into the fields." Officer Higgins watched the truck but could not pursue it due to the terrain. The patrol car did not have high enough ground clearance to travel the route the truck followed.

The truck was later found in the field. It was stuck, "hung up on a piece of ground there." The driver's door was open. The engine was running and the driver was gone.

■ Defendant's first and sixth points on appeal assert the trial court erred in denying defendant's motions for judgment of acquittal at the close of the state's evidence and at the close of all evidence. He contends the evidence was not sufficient to prove he drove with a suspended license (Point I) or that he failed to yield for an emergency vehicle (Point VI).

In Point I defendant asserts there was not sufficient evidence from which it could be found that "[defendant's] operator's license had been suspended or [that he] consciously disregarded a substantial and unjustifiable risk that his operator's license had been suspended, in that his operator's license had been suspended only thirteen days earlier for financial responsibility reasons."

He also asserts in Point I that the trial court erred in denying his motions for acquittal because there was no showing that a notice that his license was suspended had been sent to him or that he "had actual or imputed knowledge" of the suspension. He contends the evidence did not show that he "consciously disregarded a substantial risk that his operator's license had been suspended." In Point VI defendant asserts the evidence was not sufficient to show "the defendant was driving at the time the vehicle allegedly failed to yield for an emergency vehicle."

The allegations in Points I and VI are not included in defendant's motion for new trial. The motion for new trial states only, with respect to the trial court's denial of defendant's motions for acquittal at the close of the state's evidence and the close of all the evidence:

The trial court erred in overruling defendant's motion for judgement of acquittal at the close of the State's evidence and his motion for judgement of acquittal at the close of all of the evidence in that there was not sufficient evidence by which a reasonable finder of fact could find defendant guilty beyond a reasonable doubt, in

violation of defendant's right to Due Process as guaranteed to him under the Missouri Constitution and the United States Constitution.

The allegation in the motion for new trial is a general assignment of error. It is akin to allegations that "the verdict is against the law and the evidence" or "the verdict is against the weight of the evidence." General assignments of error of this sort preserve nothing for review. *See State v. Sheard,* 276 S.W.2d 196, 198 (Mo.1955).

The claims of error attempted to be stated in Points I and VI do not involve questions of jurisdiction of the trial court over an offense charged. They do not contend that the information failed to state an offense. *See* Rule 29.11(d). They preserve nothing for appellate review. Points I and VI are denied.

■ Points II and III are directed to the trial court's denial of requests for mistrial made by defendant during voir dire. Point II contends the trial court erred in denying requests for mistrial during the questioning of prospective juror Todd. Point III asserts the trial court erred in denying defendant's request for mistrial following questioning of prospective juror Abernathy.

Point II alleges the trial court erred in denying requests for mistrial because "Mr. Todd stated that he (and apparently one or more other persons) knew that the [defendant] had driven through the field, and upon questioning by the court at least implied that at some time subsequent to the driving he had learned that the driver was the [defendant]." Defendant asserts that because "identity was a key contested issue," this was error.

Point III asserts the trial court erred in denying a further request for mistrial made by defendant after Mr. Abernathy was questioned because he "commented before the entire panel that he had heard something on a police scanner and had volunteered to assist and had done so." Defendant complains that this occurred after "Todd had already within the hearing of the entire panel claimed personal knowledge of defendant's guilt."

The comments of Mr. Todd about which defendant complains occurred after the prosecuting attorney asked the panel whether they had "heard about this case in any way, read about it?" Mr. Todd answered that he thought a neighbor told him about the case, but he had not been told anything about the charges. He was asked, "But you heard something about this case?" He answered, "We knew he drove through the field and stuff, right." He was asked if that would affect his ability to make a fair and impartial decision in the case. He answered that it probably would.

Defendant's trial attorney moved for a mistrial. He argued that Mr. Todd's comments "contaminated the panel." The attorney added:

He's implied that he has some kind of personal knowledge of the facts, that which would lead him to conclude that the Defendant is guilty. I—Obviously, I think we have a strike for cause on this guy, but I think he's contaminated the whole panel at this time and I've [sic] move for a mistrial.

The discussion between defendant's attorney and the trial judge continued. The attorney complained, "Well, I think—I think— to quote him, I think he said that he knew that he drove through a field. And I think there's—I think the way he said it—You know, he didn't say, 'Well, I heard that he drove through the field,' but 'I know that he drove through a field.'"

The attorney argued, "Well, it's an identity case. He said that he knew he drove through a field. And we've been talking about Brad King."

The trial judge denied the request for mistrial. The judge asked Mr. Todd:

When you—you said that he drove through the field, I presume, by your prior answer—or a portion of your prior answer, that you did not indicate that you knew— identified Mr. King as the "he" that drove through the field, it was just whoever drove through the field; is that correct?

Mr. Todd answered, "Well, not at that time, no." Mr. Todd was asked, "You were not aware that it was Mr. King—". He answered, "No."

There was further dialogue followed by a bench conference. Defendant's attorney complained, "[N]ow he's saying, 'Well, I didn't really know at the time of the conversation,' but now is implying that he has found out at some subsequent date."

Mr. Todd was asked additional questions outside the hearing of the other panel members. He told the trial judge and the attorneys that what he heard was a description of the pickup. He was asked if Mr. King had been identified. He answered, "No."

Defendant's attorney again moved for mistrial. The request was denied.

The trial judge told the panel members that Mr. Todd's answer had been ambiguous "when he said 'he'." The panel was asked, "Is there anyone in this panel, after hearing what has happened here this morning, who cannot disregard anything that you have heard which would tend to incriminate Mr. King and render a fair and impartial verdict?" The panel members were told to "raise your hand" if they could not do so. No hands were raised.

■ The panel was asked if anyone else had prior knowledge about the case. Mr. Abernathy indicated he did. The prosecuting attorney asked where he got his information, admonishing, "I don't want to know what it was. I just want to know where you got it."

Mr. Abernathy told the attorneys and the trial court that he heard something about the case on a police scanner the night of the incident. He explained, "And when the [sic] first called out a wrecker to pull the patrol car out of the field that got stuck, I volunteered to assist and went out and pulled the other wrecker out."

Defendant's attorney again moved for a mistrial. The request was denied.

Defendant relies on *State v. Evans*, 802 S.W.2d 507 (Mo. banc 1991), in support of Points II and III. In *Evans* a prospective juror was asked how he felt about sitting in a case where the victim was a nine-year old girl who was related to the defendant in the case. He answered, "Everybody's got some kind of thoughts, *what he did to this nine*

*year old girl." · Id.* at 514 [emphasis in original]. The defendant in *Evans* moved to quash the panel or, alternatively, for mistrial. The motions were denied, after which the panel was told, "The jurors are instructed that anything said by a juror does not constitute evidence in this case." *Id.* The court held the trial court did not abuse its discretion in denying the motions.

In *Evans* the court explained:

The trial court has broad discretion in determining if a jury panel should be dismissed and its ruling should not be disturbed on appeal absent a clear abuse of discretion.... To merit quashal, movant must demonstrate that the venireman's questionable responses were so inflammatory and prejudicial that it can 'be said a right to a fair trial has been infringed.

*Id.*

Defendant argues that the circumstances of this case are more egregious than those in *Evans* because the comments of Mr. Todd and Mr. Abernathy were more that a "lone remark." He argues that Mr. Todd's statement indicated that he "had personal knowledge of the Defendant's guilt"; that what occurred during the trial court's efforts to get defendant to clarify his remarks was more damaging than the events that transpired in *Evans.*

■ The general rule is that disqualification of one or several members of a jury panel does not require declaration of a mistrial. *State v. Greathouse,* 694 S.W.2d 903, 909 (Mo.App.1985). A trial judge is in a better position to evaluate what occurs during voir dire than an appellate court. *State v. Bushman,* 642 S.W.2d 117, 120 (Mo.App. 1982). It is appropriate for a trial court to inquire of panel members, as the trial court did in this case, about whether a declaration by one prospective juror affects their abilities to fairly decide the case, and to consider the responses, or lack of responses, of the panel in determining requests for mistrial. *Id.*

■ When a defendant claims comments made during voir dire tainted the impartiality of a jury, he must demonstrate that he was prejudiced by what occurred. *State v. Greathouse, supra.* Although the manner in which the remarks of Mr. Todd were addressed might have been handled more expeditiously, there has been no showing that what transpired prejudiced defendant. Panel members were asked if they could disregard the comments of Mr. Todd that were adverse to defendant. They were told to raise their hands if they could not. No one responded. Point II is denied.

The record does not indicate that the inquiry of Mr. Abernathy and his response had any effect on the other panel members. His remark was nothing more than that he responded to a call for assistance in removing a patrol car that was stuck in a field. Point III is denied.

■ Point IV is directed to Count II of the charges of which defendant was convicted, failing to stop for a stop sign. Defendant contends the trial court erred in denying his motions for judgment of acquittal at the close of the state's case and at the close of all the evidence. He contends the evidence was insufficient to support the finding that he was driving the vehicle that allegedly failed to stop for the stop sign.

■ "For purposes of appellate review, all evidence that tends to prove defendant's guilt, together with all reasonable inferences that support the verdict of the jury, is accepted as true. *State v. Barber,* 635 S.W.2d 342, 343 (Mo.1982). Evidence contrary to the verdict is disregarded. *State v. Brooks,* 618 S.W.2d 22, 23 (Mo. banc 1981)." *State v. Hicks,* 803 S.W.2d 143, 144 (Mo.App.1991). The determination to be made is whether the evidence would have permitted a reasonable juror to have found defendant guilty beyond a reasonable doubt. *State v. Chamberlin,* 872 S.W.2d 615, 616 (Mo.App.1994).

Defendant was charged with failing to stop at a stop sign "at the intersection of Route T and SE 20th Road" in Barton County. Cpl. Stone testified that there was a stop sign at the intersection; that the pickup he was pursuing crossed the intersection without even slowing its speed.

The pickup had been pursued by Officer Deherrera or Cpl. Stone continually from the time Officer Deherrera first observed it until Cpl. Stone's patrol car was stuck in the field he entered in pursuit of the pickup. The pickup had a distinct appearance. It was a

gray flatbed pickup with items lying on the bed. It had an Oklahoma license plate.

Deputy Higgins had observed the vehicle pass through the intersection at route T with an emergency vehicle in pursuit. After briefly losing sight of the vehicles, Deputy Higgins observed them in the field. He stayed on the roadway "basically paralleling" the two vehicles in the field. Deputy Higgins was about 60 feet from the truck. He could tell the vehicle being pursued was a pickup truck with dual wheels and a flatbed.

When the patrol car became stuck in the field, the pickup was traveling in a southerly direction. Deputy Higgins proceeded to the south end of the field to try to prevent the pickup from re-entering the roadway from the field. He was driving along a road at the south end of the field when he again encountered the flatbed pickup. As the pickup backed away from him, Deputy Higgins identified defendant as its driver. The evidence was sufficient for a reasonable juror to have found defendant had been the driver of the truck that ran the stop sign at Highway T and SE 20th Road. Point IV is denied.

Point V alleges the trial court erred in denying defendant's motions for judgment of acquittal at the close of the state's case and at the close of all evidence as to the offense charged in Count III, failure to yield to an emergency vehicle while sounding audible siren signal or displaying lighted visible red light. It asserts that "the verdict director submitted the allegations of audible siren and red light disjunctively, thus requiring evidence of both existing simultaneously within 500 feet of the alleged perpetrator;" that "no evidence was presented of simultaneous lights and siren within 500 feet or less."

This allegation of error does not appear in defendant's motion for new trial. It is not preserved for appellate review. *State v. Guidorzi*, 895 S.W.2d 225, 228 (Mo.App.1995). Point V is denied. The judgment is affirmed.

MONTGOMERY, C.J., and BARNEY, J., concur.